**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, *et al.*, | ) | Bankr. Case No. 06-10859 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ———————————————— | ) | |
| | ) | |
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-313 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| GlobalSantaFe Corporation, *et al,* | ) | ADV 06-50822 |
| | ) | AP 08-29 |
| Appellees. | ) | |
| ———————————————— | ) | |
| | ) | |
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-314 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| Santa Fe Minerals Inc., | ) | ADV 06-50822 |
| | ) | AP 08-30 |
| Appellee. | ) | |
| ———————————————— | ) | |
| | ) | |
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-321 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| GlobalSantaFe Corporation, *et al.,* | ) | ADV 06-50822 |
| | ) | AP 08-29 |
| Appellees. | ) | |
| ———————————————— | ) | |

|                                      |     |                              |
|--------------------------------------|-----|------------------------------|
| BEPCO LP,                            | )   |                              |
|                                      | )   |                              |
|                                      | )   |                              |
|                      Appellant,      | )   | Civil Action No. 08-322 (SLR) |
|                                      | )   |                              |
|                     v.               | )   | Bankruptcy Case no. 06-10859 |
|                                      | )   | ADV 06-50822                 |
| GlobalSantaFe Corporation, *et al.,* | )   | AP 08-30                     |
|                                      | )   |                              |
|                      Appellees.      | )   |                              |
|                                      | )   |                              |

**BEPCO, L.P., F/K/A BASS ENTERPRISES PRODUCTION
COMPANY'S EMERGENCY REQUEST FOR CERTIFICATION
FOR DIRECT APPEAL TO THE UNITED STATES COURT OF APPEALS FOR
THE THIRD CIRCUIT PURSUANT TO 28 U.S.C. § 158(d)(2)**

BEPCO, L.P., f/k/a Bass Enterprises Production Company ("BEPCO"), pursuant

to 28 U.S.C. § 158(d)(2) and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), hereby requests (the "Certification Request") certification for direct

appeals to the United States Court of Appeals for the Third Circuit (the "Third Circuit") of its

appeals from the following entered by the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Court") in the jointly administered bankruptcy cases captioned *In re*

*15375 Memorial Corporation and Santa Fe Minerals, Inc.,* Case Nos. 06-10859 (KG) and 06-

10860 (KG) (together, the "Main Case") and the related adversary proceeding captioned *Santa*

*Fe Minerals, Inc. v. BEPCO, L.P., formerly known as Bass Enterprises Production Company,*

Adv. Pro. No. 06-50822 (KG) (the "Adversary Proceeding"):

      (a)     Findings of Fact and Conclusions of Law (Bankr. D.I. 291; Adv. D.I. 164)
(the "Opinion" or "Op.") and related Order (Bankr. D.I. 292; Adv. D.I.
165) (the "Order"), each entered on February 15, 2008, insofar as the
Opinion and Order denied the Motion of BEPCO, L.P. f/k/a Bass
Enterprises Production Company, for Order (I) Dismissing Debtors'
Chapter 11 Cases for Bad Faith, Cause Under 11 U.S.C. § 1112(b) and
Ineligibility Under 11 U.S.C. § 109, (II) Dismissing or Suspending
Debtors' Chapter 11 Cases Under 11 U.S.C. § 305(a)(1), (III) Converting
Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy

Code Pursuant to 11 U.S.C. § 1112(b), (IV) Appointing a Trustee Pursuant to 11 U.S.C. § 1104(a), or, (V) Appointing an Examiner Pursuant to 11 U.S.C. § 1104(c) and a related memorandum of law in support thereof (Bankr. D.I. 21 & 22) (together, the "BEPCO Dismissal/Conversion Motion");[1] and

(b)     Memorandum Opinion on Reargument (Bankr. D.I. 323; Adv. D.I. 193) (the "Reconsideration Opinion" or "Recon. Op.") and related Order (Bankr. D.I. 324; Adv. D.I. 194) (the "Reconsideration Order" and collectively with the Reconsideration Opinion, the "Reconsideration Opinion and Order"), each entered on April 16, 2008, insofar as the Reconsideration Opinion and Order denied BEPCO's request in the Motion of BEPCO, L.P. f/k/a Bass Enterprises Production Company For Entry Of An Order (I) Granting Reconsideration, In Part, Of The Court's Opinion And Order, Each Dated February 15, 2008; (II) Upon Reconsideration, (A) Vacating That Portion Of The Opinion And Order Denying The BEPCO Dismissal/Conversion Motion And (B) Amending The Opinion And Order To Grant The Relief Requested In The BEPCO Dismissal/Conversion Motion; And (III) Granting Related Relief (Bankr. D.I. 299; Adv. D.I. 172) (the "BEPCO Reconsideration Motion") to vacate and amend certain portions of the Opinion and Order.[2]

In support of this Certification Request, BEPCO respectfully states as follows:

## INTRODUCTION

1.      A direct and expedited appeal to the Third Circuit is necessary and crucial to serve the interests of justice in these cases.  At issue in the BEPCO Dismissal/Conversion Motion was whether debtors Santa Fe Minerals, Inc. ("Santa Fe" or "SFMI") (which at the time of its bankruptcy filing was, and remains today, an irrevocably dissolved corporation) and 15375 Memorial Corporation ("Memorial," and together with Santa Fe, the "Debtors") (which at the time of its bankruptcy was, and remains today, a shell, holding company) should be allowed to proceed with reorganization cases under chapter 11 of title 11 of the United States Code (the

---

[1]     Copies of the Opinion and Order are attached as **Exhibit A** to the proposed Certification annexed hereto.

[2]     Copies of the Reconsideration Opinion and Order are attached as **Exhibit B** to the proposed Certification annexed hereto.

"Bankruptcy Code"). The record in the Bankruptcy Court – virtually undisputed from the outset – establishes that the Debtors have no meaningful assets or source of income and that their bankruptcy filings were orchestrated as a coordinated effort to insulate GlobalSantaFe Corporation ("GSF Corp."), the Debtors' ultimate parent and one of the world's largest offshore oil and gas drilling contractors, from legacy liability resulting from Santa Fe's prior oil and gas exploration and related activities.[3]

2.      As a result of the Debtors' bankruptcy filings, BEPCO, by far the largest of the Debtors' handful of non-insider creditors, has been frustrated for nearly two years in its efforts to obtain redress for losses in excess of $20 million it has incurred as a result of claims for environmental and property damage brought against it by owners of land on which Santa Fe conducted oil and gas exploration and related activities. Only recently, by the Reconsideration Order entered on April 16, 2008, has the Bankruptcy Court granted BEPCO limited relief from the automatic stay to liquidate its claims against Santa Fe (but not Memorial) in Louisiana state court and to pursue recoveries, if any, available from liability insurers. The automatic stay under section 362 of the Bankruptcy Code otherwise remains in place and BEPCO remains barred at this time from pursuing Memorial or the non-debtor GSF Entities on alter ego, single business enterprise, wrongful distribution at dissolution and other claims and remedies that may allow BEPCO to be made whole for its losses.

3.      Proceedings on the BEPCO Dismissal/Conversion Motion have moved far slower than is typical of such litigation. The Opinion and Order, by which the Bankruptcy Court, *inter alia,* denied the BEPCO Dismissal/Conversion Motion, was not issued until

---

[3]      GSF Corp., GlobalSantaFe Corporate Services Inc. and Entities Holdings, Inc. are collectively referred to herein as the "GSF Entities".

February 15, 2008 – more than 16 months after BEPCO first moved for the dismissal of the Debtors' bankruptcy cases.[4]  In contrast, section 1112(b)(3) of the Bankruptcy Code states that a motion to dismiss or convert a chapter 11 case under section 1112(b) of the Bankruptcy Code ordinarily should be heard within 30 days of filing and should be decided within 15 days of commencement of the hearing on the motion. *See* 11 U.S.C. § 1112(b)(3).  In including this provision, Congress recognized that as far as motions to dismiss or convert chapter 11 cases under section 1112(b) are concerned, "justice delayed is justice denied".  Clearly, if ever there was an appropriate case for this maxim to be applied, this is one.

      4.     Absent an expedited consideration of these appeals, there is a substantial risk that BEPCO's ability to obtain meaningful appellate review of the Bankruptcy Court's decisions refusing to dismiss these highly questionable chapter 11 cases will be mooted.[5]  Indeed, the Debtors and GSF Entities have already begun taking steps to ensure that justice is denied BEPCO through the filing on June 2, 2008 of the Debtors First Amended Joint Plan Of Liquidation (Bankr. D.I. 351) (the "Amended Plan").  Despite delaying the filing of the Amended Plan for over two and one-half months after the Opinion and Order were issued, the

---

[4]    The causes for the delay include, among other things, numerous discovery and other collateral disputes, a failed attempt at mediation that the parties pursued at the urging of the Bankruptcy Court and the Bankruptcy Court's reluctance to decide these matters without the development a substantial factual record.

[5]    Indeed, the Debtors are already on record asserting that the Bankruptcy Court retains jurisdiction, notwithstanding these appeals, to confirm a plan. *See* Debtors' Response In Opposition To Motion Of BEPCO, L.P., f/k/a Bass Enterprises Production Company For Entry Of An Order (I) Granting Reconsideration, In Part, Of The Court's Opinion And Order, Each Dated February 15, 2008; (II) Upon Reconsideration, (A) Vacating That Portion Of The Opinion And Order Denying The BEPCO Dismissal/Conversion Motion And (B) Amending The Opinion And Order To Grant The Relief Requested In The BEPCO Dismissal/Conversion Motion; And (III) Granting Related Relief (Bankr. D.I. 305; Adv. D.I. 177), at ¶ 22 n.5.

Debtors are now aggressively pursing confirmation of the Amended Plan and have scheduled a hearing to approve the related disclosure statement (Bankr. D.I. 352) for June 27, 2008 at 11:00 a.m. (ET), with objections purportedly due by June 20, 2008 (Bankr. D.I. 354).

5.    The Amended Plan, like the predecessor plan that the Bankruptcy Court rejected in the Opinion, contains impermissible third party releases and injunctions (Amended Plan, §§ 8.1, 8.2 & 8.3) that would, *inter alia,* deny BEPCO any ability to obtain a recovery from the non-debtor GSF Entities without in any way compensating it for the extinguishment of its valuable claims.  The Amended Plan is particularly offensive and overreaching in that it attempts to deny BEPCO the right to vote on the Amended Plan by deeming it "unimpaired" (Amended Plan, § 3.3.6) under section 1124 of the Bankruptcy Code by reason of the possibility that BEPCO's claims might someday be satisfied by liability insurance proceeds (and notwithstanding that none of the Debtors' liability insurers have agreed to cover BEPCO's claims and the action the Bankruptcy Court authorized BEPCO to commence in Louisiana state court is in its early stages).  Thus, if the Debtors and GSF Entities have their way while these appeals are pending, BEPCO will be stripped of its claims against the GSF Entities pursuant to an Amended Plan on which BEPCO would not be permitted to vote.

6.    Furthermore, as contemplated by 28 U.S.C. § 158(d)(2)(A)(i) and (ii), these appeals involve no less than three (3) dispositive questions of law as to which there is either no controlling decision of the Third Circuit or United States Supreme Court and/or conflicting decisions which render the law unsettled.  The first question of law raised by these appeals is whether the Bankruptcy Court, once it finds "cause" under section 1112(b)(4)(A) of the Bankruptcy Code based on "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation", retains the discretion under section

1112(b) of the Bankruptcy Code not to dismiss or convert the case or appoint a trustee. There is no decision of the Third Circuit or Supreme Court which controls the application of this aspect of section 1112(b) of the Bankruptcy Code since it was extensively amended by Congress pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), and lower court decisions have been inconsistent in their interpretation of the post-BAPCPA version of this statute.

       7.    The second question of law raised by these appeals is whether the Bankruptcy Court erred in not dismissing the Debtors' chapter 11 cases for lack of good faith when the largely undisputed record establishes that the commencement and continuation of these liquidating chapter 11 cases was unnecessary to preserve value that would have been lost outside of bankruptcy and serves only to frustrate legitimate creditor action. Although BEPCO believes that controlling decisions of the Third Circuit dictate that the Debtors' chapter 11 cases must be dismissed for lack of good faith, the Bankruptcy declined to reach this conclusion. Additionally, in allowing the cases to continue, the Bankruptcy Court relied on case law which it has construed in a manner in conflict with the decisions BEPCO believes require the dismissal of these chapter 11 cases.

       8.    The third question of law raised by these appeals is whether Santa Fe, as a dissolved corporation, remains eligible to be a debtor under chapter 11 of the Bankruptcy Code when its dissolution was irrevocable long before the filing of its chapter 11 petition such that rehabilitation was a legal impossibility from the very outset. Once again, there is no controlling decision in this Circuit, although Circuit level authority from elsewhere would require the dismissal of Santa Fe's chapter 11 case.

9.      In summary, these appeals are uniquely suited to proceed by direct appeal to the Third Circuit because they both involve unsettled issues of federal bankruptcy law in the Third Circuit and because their prompt adjudication will materially advance the underlying chapter 11 cases in the most fundamental way by resolving the threshold issue of whether the Debtors' chapter 11 cases should be allowed to proceed at all. Accordingly, BEPCO respectfully submits that certification of its appeals for direct review in the Third Circuit is mandated under 28 U.S.C. § 158(d)(2).

### FACTS NECESSARY TO UNDERSTAND THE QUESTIONS PRESENTED

10.     On August 16, 2006 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned, jointly administered bankruptcy cases.

11.     BEPCO and the Debtors have been litigating the BEPCO Dismissal/Conversion Motion since September 2006. Additionally, the GSF Entities, each non-debtor, insider affiliates of the Debtors, have actively participated in proceedings on the BEPCO Dismissal/Conversion Motion and related matters since their earliest stages.

12.     The Bankruptcy Court initially considered the BEPCO Dismissal/Conversion Motion at a hearing commenced on October 19, 2006. At the conclusion of that hearing, the Bankruptcy Court took the BEPCO Dismissal/Conversion Motion under advisement. It, however, did not render a decision on the BEPCO Dismissal/Conversion Motion, deferring its ruling until the development of a more complete record. The BEPCO Dismissal/Conversion Motion was again considered by the Bankruptcy Court at a two-day hearing commenced on September 17, 2007. Post-trial briefing followed and was completed by November 2, 2007.

13.    Approximately three and one-half months later, on February 15, 2008, the Bankruptcy Court entered the Opinion and Order, *inter alia,* denying the BEPCO Dismissal/Conversion Motion.  In its Opinion, the Bankruptcy Court rejected BEPCO's request to dismiss the chapter 11 cases on account of the Debtors' lack of good faith and to dismiss Santa Fe's chapter 11 case on account of its ineligibility.  The Opinion, however, did not separately address, among other things, BEPCO's request to have the Debtors' chapter 11 cases dismissed for cause pursuant to section 1112(b)(4)(A) of the Bankruptcy Code.

14.    The Bankruptcy Court's refusal to dismiss the chapter 11 cases came notwithstanding its extensive findings of fact, made from a largely undisputed record, which included the following:

i.    The Debtors' chapter 11 cases were "not filed in furtherance of preserving any going concern or maximizing value of any non-insurance assets." (Op. at 66)

ii.    The Debtors' "assets other than insurance proceeds are negligible . . ." (Op. at 67)

iii.    As of the commencement of the bankruptcy cases, the Debtors had no funds other than $100,000 advanced by one of the GSF Entities to Memorial pursuant to a note issued in contemplation of the Debtors' bankruptcy filing. (Op. at 24-25)

iv.    "[T]here [is no] reason to believe that the proceeds of the liability insurance policies will be insufficient to satisfy all claims presented." (Op. at 66)

v.    "[I]t is highly doubtful, given the circumstances of these cases, that the Debtors have any equitable interest in the proceeds of the liability insurance policies at issue . . . or in the Alter Ego Claims." (Op. at 74)

vi.    While certain liability insurance policies were reviewed and notices were sent to certain of the insurance companies during the pendency of their bankruptcy cases, those activities were performed by personnel of one of the GSF Entities, were "undertaken for the benefit of the entire GlobalSantaFe corporate family" and their "overall goal . . . was to compile a database of policies that could be reviewed as claims came up

against any [GlobalSantaFe] entity, whether it be the Debtors or others." (Op. at 35-36)

vii. "The Court is not satisfied that the Debtors have the necessary incentive to pursue its insurers . . . ." (Op. at 73)

viii. The Debtors' estates are administratively insolvent, have experienced a cash shortfall throughout these cases, and because "[t]he Debtors have no reliable source of income, . . . the only likely outcome is that the cash shortfall will continue to increase." (Op. at 46-48)

ix. The Debtors have allowed more than $350,000 in professional fees and alleged intercompany obligations to the GSF Entities to accrue (and for which no formal applications for allowance and payment have yet been filed) and currently have no funds with which to satisfy such obligations. (Op. at 48)

x. The Debtors' liquidating plan (Bankr. D.I. 222) (i) contained "no commitment from any insurer to fund the distributions to claimants such as BEPCO" (Op. at 70), (ii) offered no "effective mechanism that would ensure that insurance recoveries could be procured on a more expedited basis than were BEPCO left to its own devices" (Op. at 70), (iii) was conditioned on the grant to the GSF Entities of "a permanent injunction" notwithstanding the Debtors' inability "to demonstrate that this is the rare case where such extraordinary relief is appropriate" (Op. at 77), and (iv) would grant the "GSF Entities . . . the protection of releases and channeling injunctions well before they may ever be called upon to provide any material assistance to the Plan trustee." (Op. at 70)

xi. Santa Fe, which has been "dissolved since December 2000", "has no officers, directors or employees and engages in no business", and its "defunct status is undisputed and a matter of public record in these cases." (Op. at 7)

xii. "Memorial is . . . a holding company with no employees and engages in no business other than to act as the sole shareholder of Santa Fe." (Op. at 6) Memorial had previously dissolved and then had its dissolution revoked "'under the advice of counsel in litigation.'" (Op. at 6)

xiii. Each of the Debtors is a wholly-owned subsidiary of GlobalSantaFe Corporation, which, with other members of its corporate family, is one of the world's largest offshore oil and gas drilling contractors and a leading provider of drilling services. (Op. at 7)

xiv. At all times from and after commencement of the Debtors' chapter 11 cases, all directors of Memorial have been officers of GlobalSantaFe, and

most, if not all, officers of Memorial have been officers of GlobalSantaFe or other non-debtor members of its corporate family. (Op. at 10)

xv. David E. Faure, the Debtors' sole representative in the chapter 11 cases who has sole responsibility for the Debtors' alleged efforts to recover funds from the GSF Entities, reports directly to the General Counsel of GlobalSantaFe and testified at trial "that the filing of a lawsuit against [GlobalSantaFe] on behalf of the Debtors to facilitate the return of upstreamed funds would jeopardize his job." (Op. at 9-10)

xvi. Approximately one week prior to the filing of the Debtors' chapter 11 cases, David E. Faure caused Memorial to execute a note pursuant to which it agreed, *inter alia,* that (i) "it accepts all liabilities existing or arising from the activities of Santa Fe", (ii) "it is not a single business enterprise with . . . GlobalSantaFe Corporation . . . or any affiliate of GlobalSantaFe Corporation", and (iii) to defend and indemnify its immediate parent, one of the GSF Entities, from all claims related to Santa Fe's operations. (Op. at 23-24)

xvii. At the time the Debtors commenced their chapter 11 cases, "[t]he Debtors were aware that the Tebow Plaintiffs were seeking $320 million from Santa Fe and BEPCO for remediation of" property allegedly damaged primarily through Santa Fe's activities thereon and that the Tebow Plaintiffs would dismiss Santa Fe from the litigation were it to file bankruptcy. (Op. at 16)

xviii. At the time the Debtors commenced their chapter 11 cases, the Debtors and the GSF Entities were aware that both the Tebow Plaintiffs and BEPCO had threatened to pursue GlobalSantaFe Corporation under Louisiana's single business enterprise doctrine, which is akin to alter ego liability. (Op. at 22-23)

xix. "A motivation for the filing of the Debtors' bankruptcy cases was to cut off the potential future exposure of the [non-debtor] GSF Entities for claims made against the Debtors." (Op. at 22)

xx. Aside from the proofs of claim filed by BEPCO, the insider GSF Entities and Santa Fe's own professionals, only ten (10) proofs of claim have been filed in the Debtors' bankruptcy cases, (i) six (6) of which are claims by taxing authorities that "relate primarily to property of non-debtor affiliates and do not represent obligations of the debtors" (Op. at 29) and (ii) two (2) of the proofs of claim relate to personal injury actions concerning which the coverage may be available under "insurance policies separate and distinct from those likely to provide coverage for BEPCO's claims." (Op. at 68)

15. Following the entry of the Opinion and Order, BEPCO timely filed the BEPCO Reconsideration Motion. In the BEPCO Reconsideration Motion, BEPCO identified three principal bases for the reconsideration, vacatur and amendment, in part, of the Opinion and Order. First, BEPCO argued that the facts as found by the Bankruptcy Court and as stipulated by the parties in the Opinion and Order established "cause" under section 1112(b)(4)(A) of the Bankruptcy Code and that dismissal or other relief under section 1112(b)(1) was therefore required. Second, again principally relying upon the facts as found by the Bankruptcy Court or as stipulated by the parties, BEPCO argued that the Bankruptcy Court had misapprehended its position that the Debtors' chapter 11 cases should be dismissed for lack of good faith because they failed to advance any valid bankruptcy purpose as required by *NMSBPCSLDHB, L.P., v. Integrated Telecom Express, Inc.,* 384 F.3d 108, 118 (3d Cir. 2004). Third, BEPCO pointed out that the Bankruptcy Court had failed to consider the undisputed fact that Santa Fe's dissolution could no longer be revoked and, as a result, had misapplied the law under section 109(d) of the Bankruptcy Code which would have made Santa Fe ineligible to be a chapter 11 debtor. The matters at issue in the BEPCO Reconsideration Motion correspond directly with the legal questions presented in this Certification Request.

16. Although the Bankruptcy Court granted BEPCO's request for reconsideration of the Opinion and Order, upon reconsideration, the Bankruptcy Court denied BEPCO's request to vacate and amend the relevant portions of its Opinion and Order. While acknowledging that the elements of "cause" under section 1112(b)(4)(A) of the Bankruptcy Code were present, the Bankruptcy Court refused to grant the relief required by section 1112(b)(1) of the Bankruptcy Code based upon its misapplication of the limited exceptions to section 1112(b)(1)'s directive that the Bankruptcy Court "shall" dismiss or convert a chapter 11 case

upon a finding of cause. Specifically, the Bankruptcy Court relied on the exception set forth in section 1112(b)(2) even though it found cause under section 1112(b)(4)(A), which made the exception unavailable to the Debtors as a matter of law. (Recon. Op. at 8) Additionally, the Bankruptcy Court deemed "special circumstances" to be present in these liquidating, virtually no asset bankruptcy cases based on its findings that the Debtors had accomplished the following in the more than 20 months the chapter 11 cases had been pending when the Reconsideration Opinion was issued:

> 1. In the Insurance Review Program, the Debtors have identified insurance policies which will inure to the benefit of the claimants, including BEPCO.
>
> 2. Debtors have given and continue to give notice of claims to insurers for the benefit of creditors.
>
> 3. Debtors have preserved claims for indemnity and defense costs relating to the Tebow Action.
>
> 4. Debtors have obtained dismissal of litigation or claims from which they otherwise might have been damaged.

(Recon. Op. at 6-7)[6]

17.    On April 28, 2008, BEPCO timely filed notices of appeal from (a) Opinion and Order (Bankr. D.I. 329; Adv. D.I. 197) and (b) the Reconsideration Opinion and Order (Bankr. D.I. 330; Adv. D.I. 198).[7]

---

[6]    Although the Bankruptcy Court granted reargument and reconsideration without limitation, its Reconsideration Opinion did not specifically address BEPCO's requests to vacate and amend the Opinion and Order to dismiss Santa Fe's bankruptcy case because of its ineligibility to be a chapter 11 debtor under section 109(d) of the Bankruptcy Code. Additionally, the Bankruptcy Court only commented briefly on BEPCO's request to reconsider its decision not to dismiss the Debtors' chapter 11 cases for lack of good faith. (Recon. Op. at 7-8)

[7]    Under established Third Circuit precedent, the Opinion and Order and Reconsideration Opinion and Order are final orders within the meaning of 28 U.S.C. § 158(a). *See, e.g.,*
(Continued . . .)

18.    On May 7, 2008, the Debtors and the GSF Entities each filed notices of cross-appeal from the Opinion and Order and the Reconsideration Opinion and Order (Bankr. D.I. 336 & 337; Adv. D.I. 206 & 207).

19.    All appeals were subsequently docketed with this Court on May 27 & 29, 2008 and assigned the following case numbers: 08-313 (SLR), 08-314 (SLR), 08-318 (SLR), 08-319 (SLR), 08-321 (SLR), 08-322 (SLR), 08-325 (SLR) and 08-326 (SLR).[8]

20.    On the date hereof, the Debtors and GSF Entities filed a motion requesting the consolidation of all of the appeals and their joint administration under a single caption.[9]

## QUESTIONS PRESENTED

21.    The issues in BEPCO's appeals of the Opinion and Order and Reconsideration Opinion and Order include the following dispositive legal questions:

a.    Whether the Bankruptcy Court, once it found "cause" under section 1112(b)(4)(A) of the Bankruptcy Code based on "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation", retained the

_____

(. . . continued)

*In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999) (recognizing appellate jurisdiction from order denying dismissal of chapter 11 case as final order); *In re Brown*, 916 F.2d 120, 121 (3d Cir. 1990) (order of bankruptcy court denying creditor's motion to dismiss debtor's chapter 11 proceedings final under 28 U.S.C. § 158(a)); *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 104 (3d Cir. 1990) ("The order refusing to dismiss the bankruptcy petition is . . . appealable.")

[8]    Because there were direct and cross appeals from both the Opinion and Order and the Reconsideration Opinion and Reconsideration Order and because each of those decisions was docketed in both the Main Case and the Adversary Proceeding, eight related appeals have been docketed by the Clerk.

[9]    BEPCO does not oppose the joint administration of the appeals under a single caption for procedural purposes only. Out of an abundance of caution, this Certification Request has been filed separately in each of the appeals initiated by BEPCO because the motion of the Debtors and the GSF Entities is still pending and has not yet been acted upon by this Court.

discretion under section 1112(b) of the Bankruptcy Code sufficient to allow it not to dismiss or convert the case or appoint a trustee on this record.

b.    Whether, in denying BEPCO's request to dismiss the Debtors' chapter 11 cases for lack of good faith, the Bankruptcy Court disregarded the proper legal standard that requires a chapter 11 petition filed when no rehabilitation is intended or possible to preserve value for creditors that would be lost without bankruptcy protection.

c.    Whether the Bankruptcy Court erred in failing to dismiss Santa Fe's bankruptcy case on the basis of its ineligibility to be a chapter 11 debtor under section 109(d) of the Bankruptcy Code, notwithstanding that it was absolutely impossible for Santa Fe to reorganize under chapter 11 because its dissolution had become irrevocable long before its bankruptcy case was filed.

## RELIEF SOUGHT IN THE APPEALS

22.    By its appeals, BEPCO seeks the entry of orders: (a) reversing the Opinion and Order insofar that they denied the BEPCO Dismissal/Conversion Motion and remanding the cases to the Bankruptcy Court with instructions to dismiss the Debtors' chapter 11 cases with prejudice, subject to a limited retention of jurisdiction for the purpose of determining BEPCO's entitlement, if any, to recover its fees and expenses; and (b) reversing the Reconsideration Opinion and Order insofar that they denied BEPCO's request to vacate and amend, in part, the Opinion and Order and remanding the cases to the Bankruptcy Court with instructions to dismiss the Debtors' chapter 11 cases with prejudice, subject to a limited retention of jurisdiction for the purpose of determining BEPCO's entitlement, if any, to recover its fees and expenses.

### BASES FOR CERTIFICATION

23.    Enacted as part of the BAPCPA, 28 U.S.C. § 158(d)(2)(A) streamlines the bankruptcy appeals process by providing direct access to the United States Courts of Appeals through a two-step certification process. House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 148-49 (2005).

24.    For an appeal to be made directly to the relevant United States Court of Appeals, either the relevant bankruptcy court, the relevant district court or the parties acting jointly must certify that one of the following criteria has been satisfied:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; *or*
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A)(i) – (iii) (emphasis added).[10]  Certification is mandatory if any one of these three circumstances exists.[11]  *See* 28 U.S.C. § 158(d)(2)(B).

------

[10]    If it is certified that the criteria set forth in section 158(d)(2)(A) has been satisfied, the relevant United States Court of Appeals must authorize the direct appeal. *See* 28 U.S.C. § 158(d)(2)(A). "Jurisdiction for the direct appeal would exist in the circuit court of appeals only if the court of appeals authorizes the direct appeal." House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 148-49 (2005)

[11]    As one leading commentator explains, "Section 158(d)(2) was apparently suggested by 28 U.S.C. § 1292(b)." 1 COLLIER ON BANKRUPTCY ¶ 5.05A[2] at 5-18 (15th ed. rev. 2008). However, the standard under section 158(d)(2) is significantly more relaxed than that applied under section 1292(b). "[W]hile any one of the four criterial set out [in section 158(d)(2) would fulfill the statutory predicate for a certification, section 1292(b) requires both a controlling question of law *and* a certification that an immediate appeal would advance the litigation. Thus, decisions interpreting section 1292(b) will be helpful
(Continued . . .)

25.    While the presence of only one of the three circumstances set forth in Section 158(d)(2)(A) is required for certification, all three circumstances are present in the appeal currently before this Court.

**A.    The BEPCO Appeals Involve Questions Of Law As To Which There Is No Controlling Third Circuit Or Supreme Court Decision And Involve Matters Of Public Importance**

      **i.    No Decision Of The Third Circuit Or The Supreme Court Controls The Questions Of Law Involved In The BEPCO Appeals**

           a.    <u>Section 1112(b) Of The Bankruptcy Code</u>

26.    With the enactment of BAPCPA, section 1112 of the Bankruptcy Code underwent a major overhaul.  Specifically, section 1112(b) – the provision at issue here – was substantially redrafted.  The amendments to section 1112(b) "materially circumscribed the court's discretion to convert or dismiss a chapter 11 case for cause in significant ways."  7 COLLIER ON BANKRUPTCY ¶ 1112.01[2][a] at 1112-8.1.

27.    Under the pre-BAPCPA version of section 1112(b) of the Bankruptcy Code, a finding of "cause" may have led to conversion or dismissal or it may not have – it was a matter left entirely to the discretion of the bankruptcy court.[12]  As revised, section 1112(b)(1) now provides:

> [A]bsent unusual circumstances specifically identified by the court
> that establish that the requested conversion or dismissal is not in
> the best interests of creditors and the estate, the court ***shall*** convert

---

(. . . continued)

but by no means determinative in certain cases." 1 COLLIER ON BANKRUPTCY ¶ 5.05A[2] at 5-19.

[12]    The pre-BAPCPA version of section 1112(b)(1) provided that upon a finding of cause, "the court *may* convert a case under . . . chapter [11], whichever is in the best interest of creditors and the estate . . . ." 11 U.S.C. § 1112(b)(1) (emphasis added).

a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis added).

28.    Section 1112(b)(2), in turn, provides:

The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the state, if the debtor or another party in interest objects and establishes that –

(A)    there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time; and

(B)    the grounds for granting such relief include an act or omission of the *debtor other than under paragraph (4)(A)-*

(i)    for which there exists a reasonable justification for the act or omission; and

(ii)    that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).  Thus, the express terms of the section 1112(b)(2) exception to section 1112(b)(1)'s mandatory dismissal for cause make the exception unavailable when, as the Bankruptcy Court found here, cause is based on "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" under section 1112(b)(4)(A).

29.    Only a handful of lower courts (and no Circuit courts) have considered the interplay between sections 1112(b)(1), 1112(b)(2) and 1112(b)(4)(A) since the BAPCPA amendments to section 1112 became effective.  Of these, at least two courts have held that sections 1112(b)(1) and 111(b)(2) must be read together so that "[i]f the movant establishes 'cause,' then the burden shifts to the debtor or other party in interest to prove that the cause falls within the § 1112(b)(2) 'unusual circumstances' exception to § 1112(b)(1)'s mandatory

conversion or dismissal." *In re Emergystat of Sulligent, Inc.*, No. 07-51394, 2008 WL 597613, at *6 (Bankr. E.D. Tenn. Feb. 29, 2008*). See also In re Gateway Solutions, Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).

      30.    As section 1112(b) has been construed by these courts, as a matter of law, a debtor could never carry its burden to establish "unusual circumstances" where "cause" is based on section 1112(b)(4)(A) because section 1112(b)(2) is viewed as the source of the statutory authority for a debtor resisting the mandatory grant of relief under section 1112(b)(1) and section 1112(b)(2) is expressly unavailable when cause under section 1112(b)(4)(A) is established. It can be inferred from the Bankruptcy Court's exercise of discretion in the Reconsideration Opinion not to grant relief under section 1112(b)(1) that it rejected this construction of the statute. BEPCO respectfully submits that this was legal error by the Bankruptcy Court that requires reversal of the Opinion and Order.

      31.    In contrast, at least one bankruptcy court has stated in dicta and without analysis that it retains the discretion not to grant relief under section 1112(b)(1), despite a finding of cause under section 1112(b)(4)(A). *See In re the 1031 Tax Group, LLC,* 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007). Neither this court nor any other court, however, has attempted to answer the question why Congress would amend section 1112(b) to deny a debtor the opportunity to defeat a request for relief under section 1112(b)(1) by establishing "unusual circumstances" under section 1112(b)(2) after a finding of cause pursuant to section 1112(b)(4)(A) while at the same time allowing the bankruptcy court discretion to deny relief after a finding of such cause pursuant to section 1112(b)(1).

      32.    There are only two possible interpretations that can be reconciled with the statute's express language. As interpreted by the *Emergystat* and *Gateway Solutions* courts,

Congress meant for sections 1112(b)(1) and 1112(b)(2) to be read together to foreclose an "unusual circumstances" defense to a motion to dismiss or convert under section 1112(b)(1) when cause is based on section 1112(b)(4)(A). Alternatively, Congress may have meant to leave some discretion to the bankruptcy court not to grant relief under section 1112(b)(1), but intended that the "unusual circumstances" proven in such a situation to be far more compelling and extraordinary than the generic "unusual circumstances" that would suffice were section 1112(b)(4)(A) not the source of the "cause" finding.[13]

33.    While BEPCO believes that under any definition of "unusual circumstances" the Bankruptcy Court's failure to dismiss the Debtors' chapter 11 cases constituted reversible error, it is clear from the Reconsideration Opinion that (assuming relief can ever be denied on the basis of "unusual circumstances" when cause is based on section 1112(b)(4)(A)) the Bankruptcy Court committed legal error by failing to demand that the Debtors come forward with the type of compelling and truly extraordinary "unusual circumstances" that could justify denying relief under section 1112(b)(1) when section 1112(b)(4)(A) supplies "cause" for relief. Indeed, the Bankruptcy Court did not even attempt to invoke the "unusual circumstances" label, choosing instead to deny relief based on a finding of "special circumstances," which is not a term used in the statute. (Recon. Op. at 6)

34.    With its redrafting of section 1112(b), Congress, unfortunately, has created a statute that, in some respects, has a meaning as clear as mud. Nevertheless, Congress's

---

[13]    One commentator states: "Although section 1112(b) does not defined the phrase 'unusual circumstances,' it clearly contemplates conditions that are not common in most chapter 11 cases" and that "the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[3] at 1112-26.

intent to substantially "limit the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause" is evident. *Gateway Access*, 374 B.R. at 560. See also 7 COLLIER ON BANKRUPTCY ¶ 1112.04[1] at 1112-19 to 1112-20 ("As amended in 2005, section 1112(b) materially circumscribes the court's discretion to convert or dismiss a chapter 11 case for cause in several important ways."). What is not entirely clear and what neither the Supreme Court nor the Third Circuit has yet addressed is whether, when cause is based on section 1112(b)(4)(A), the bankruptcy court retains any discretion to deny relief under section 1112(b)(1) and, even if it has such discretion, what the standard against which its exercise of discretion should be measured.

   b.  <u>Lack Of Good Faith</u>

   35.  BEPCO argued to the Bankruptcy Court that application of the standards developed by the Third Circuit in *NMSBPCSLDHB, L.P., v. Integrated Telecom Express, Inc.,* 384 F.3d 108 (3d Cir. 2004) and *In re SGL Carbon Corp.,* 200 F.3d 154 (3d Cir. 1999), requires dismissal of the Debtors' chapter 11 cases. Specifically, *Integrated Telecom* provides that a chapter 11 petition filed when no reorganization is intended and possible "must either preserve some going concern value, e.g., by liquidating a company as a whole or in such a way as to preserve some of the company's goodwill, or by maximizing the value of the debtor's estate." *Integrated Telecom,* 384 F.3d at 120 n.4. As explained by the Third Circuit, "[t]o say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy." *Id.* at 120. BEPCO respectfully submits that the clear answer, even on the record found by the Bankruptcy Court, is that the Debtors' chapter 11 cases do not serve the purpose of preserving value that would be lost outside of bankruptcy and merely serve to frustrate legitimate creditor action.

36.     The Bankruptcy Court, however, apparently disagreed that *Integrated Telecom* and *SGL* control on these facts and relied on a handful of decisions (which, as discussed below, are themselves in conflict with other decisions relied upon by BEPCO) that stand for the general proposition that a chapter 11 bankruptcy case may be maintained for the purpose of conducting an orderly liquidation of the debtor's assets for the benefit of creditors. (Op. at 55-56) (collecting cases).  Thus, assuming without conceding the correctness of the Bankruptcy Court's apparent conclusion that *Integrated Telecom* and *SGL* do not control the outcome, there would be no Third Circuit or Supreme Court decision dispositive of whether the Debtors' chapter 11 cases should be dismissed for lack of good faith.

      c.         <u>Section 109(d) Of The Bankruptcy Code</u>

37.     As the cases cited in the parties' briefs, the Opinion and Order and the Reconsideration Opinion and Order indicate, there is no controlling Third Circuit or Supreme Court authority discussing whether a dissolved corporation whose dissolution can no longer be revoked, like Santa Fe, is eligible to proceed as a chapter 11 debtor pursuant to section 109(d) of the Bankruptcy Code.

38.     For all of the foregoing reasons, the Opinion and Order clearly present questions of law that are eligible for direct appeal to the Third Circuit under 28 U.S.C. § 158(d)(2)(A)(i) and therefore certification is required under 28 U.S.C. § 158(d)(2)(B).

**ii.     The Opinion And Order Involve Questions Of Law Which Are Matters Of Public Importance**

39.     28 U.S.C. § 158(d)(2)(A)(i) provides an additional ground for direct appeal where "the judgment, order or decree . . . involves a matter of public importance."

40.     As a threshold matter, there is a long standing and well established policy interest in policing the bankruptcy process against abusive and bad faith filings. *See, e.g., In re*

*Froment,* 171 B.R. 170, 173 (Bankr. D. Mass. 1994) ("[T]he public interest dictates a result that discourages abusive and bad faith filings. Such filings mire the bankruptcy process in the eyes of the public . . . ."). Indeed, the very origin of the requirement of good faith is in preventing "'abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .'" *SGL,* 200 F.3d at 161 (quoting *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986)). These appeals directly put before the Court the question of whether these Debtors are misusing the chapter 11 process and, accordingly, clearly implicate a matter of public importance.

   41. Furthermore, section 1112(b) of the Bankruptcy Code was recently redrafted as a part of BAPCPA. Interpreting this recent overhaul of the statute is of public importance as it will instruct courts in the Third Circuit (and provide guidance to bankruptcy courts elsewhere) regarding the proper application of these provisions on a going-forward basis.

   42. For these additional reasons, certification is required by 28 U.S.C. § 158(d)(2)(B).

**B.** **The Opinion And Order Involve Questions Of Law Requiring Resolution Of Conflicting Decisions**

   **i.** **Section 1112(b) Of The Bankruptcy Code**

   43. As discussed in paragraphs 26 through 34 above, since the BAPCPA amendments to section 1112(b) became effective, only a handful of lower courts have considered the interplay between sections 1112(b)(1) and 1112(b)(2) following a finding of cause under section 1112(b)(4)(A). These few decisions contain limited analysis and are in some disagreement. The requirement of conflicting decisions is satisfied as to this issue.

### ii.    Lack Of Good Faith

44.    Many courts have been asked to consider whether good faith is lacking in the context of a debtor's bankruptcy case.    While BEPCO believes that the Third Circuit's *Integrated Telecom* and *SGL* decisions control and require the dismissal of the Debtors' cases, the Bankruptcy Court apparently reached a differenced conclusion.    Absent consideration of *Integrated Telecom* and *SGL* as controlling authority, BEPCO acknowledges that certain of the lower court authorities are in disarray.

45.    For example, in their respective briefs the Debtors and the GSF Entities cite to various, non-binding authority which they assert support of their contention that the Debtors' chapter 11 cases were filed in good faith as (i) a bankruptcy proceeding is a viable alternative to a properly conducted dissolution process under state law even if no other bankruptcy purpose is served and (ii) a bankruptcy court is available as a centralized forum to make distributions to creditors.[14]  *Contra, e.g., In re Mazzocone,* 183 B.R. 402, 412 (Bankr. E.D. Pa. 1995) ("Without first determining that a bankruptcy liquidation (with all that it entails) is appropriate under the facts of the case, it does not follow that preservation of equal distribution for its own sake is warranted, since that policy is neither inherently desirable nor justified outside of bankruptcy."), *aff'd,* 200 B.R. 568 (E.D. Pa. 1996).

---

[14]    See, e.g., GlobalSantaFe Entities' Proposed Findings Of Fact And Conclusions Of Law With Respect To Those Matters Heard On September 17-18, 2007 (Bankr. D.I. 256; Adv. D.I. 141) at ¶¶ 57-72; Proposed Findings Of Fact And Conclusions Of Law Submitted By Debtors In Connection With (I) Debtors' Motion For Preliminary Injunctive Relief (Adversary D.I. 3), Bass' Motion To Dismiss And Other Relief (D.I. 21), And (III) Bass' Motion For Modification Of The Automatic Stay (D.I. 23) (Bankr. D.I. 259; Adv. D.I. 140) at ¶¶ 226-243.

### iii.    Section 109(d) Of The Bankruptcy Code

46.    Lastly, with respect to whether Santa Fe, a dissolved corporation that no longer has the option of revoking its dissolution, is eligible to be a debtor pursuant to section 109(d) of the Bankruptcy Code, BEPCO has continuously maintained that the bankruptcy court, district court and Second Circuit decisions in *C-TC 9th Ave. P'Ship v. Norton Co. (In re C-TC 9th Ave. P'Ship)*, 193 B.R. 650 (Bankr. N.D.N.Y. 1995*), aff'd*, 196 B.R 666 (N.D.N.Y. 1996), *aff'd*, 113 F.3d 1304 (2d Cir. 1997), are directly apposite and require the dismissal of Santa Fe's chapter 11 petition. However, at least one bankruptcy court has disagreed with this line of cases.

47.    In *C-TC,* the court held that a dissolved New York partnership was not eligible to proceed under chapter 11, pointing to the inability of the dissolved partnership to seek reinstatement as the barrier preventing it from qualifying for chapter 11 relief. *C-TC,* 113 F.3d at 1309 ("The estate reinstatement allowed a New York corporation is not available to a New York partnership."). In contrast, in *In re Statepark Building Group, Ltd.,* 316 B.R. 466, 475 (Bankr. N.D. Tex. 2004), the bankruptcy court rejected this analysis.

48.    These conflicting decisions with respect to section 1112(b) of the Bankruptcy Code, lack of good faith and eligibility pursuant to section 109(d) of the Bankruptcy Code represent important issues of law that urgently need appellate clarification. Thus, questions of law eligible for appeal under 28 U.S.C. § 158(d)(2)(A)(ii) exist and therefore certification is required under 28 U.S.C. § 158(d)(2)(B).

### C.    Expedited Direct Appeals To The Third Circuit Will Materially Advance The Progress Of The Chapter 11 Cases

49.    BEPCO's appeals go to the must fundamental question at issue in these bankruptcy cases – whether they should be allowed to continue at all. This issue has been an overhang for the more than 21 months these chapter 11 cases have been pending. Furthermore,

as discussed above, the Debtors and the GSF Entities are taking steps through the filing of the Amended Plan and aggressive scheduling of proceedings thereon to thwart the adjudication of this threshold issue. Thus, unless this Court and the Third Circuit act promptly to advance the adjudication of BEPCO's appeals, BEPCO may be denied effective appellate relief and these important legal questions that go to the very heart of how and for whose benefit the bankruptcy process may properly be utilized may never be answered.

50.     In summary, BEPCO respectfully submits that its appeals clearly include issues eligible for direct appeal to the Third Circuit under 28 U.S.C. § 158(d)(2)(A)(iii) and therefore certification is required under 28 U.S.C. § 158(d)(2)(B).

### D. DEL. L.R. 7.1.1 STATEMENT

51.     To the extent applicable, the undersigned counsel for BEPCO hereby certifies in accordance with Rule 7.1.1 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware that a reasonable effort has been made to reach agreement with the Debtors and the GSF Entities with respect to this Certification Request.

[CONTINUED NEXT PAGE]

## CONCLUSION

52.    For the foregoing reasons, BEPCO respectfully requests this Court enter

the annexed proposed Certification certifying BEPCO's appeals for direct appeal to the Third

Circuit pursuant to 28 U.S.C. § 158(d)(2) and Bankruptcy Rule 8001(f).

Dated: Wilmington, Delaware          MORRIS, NICHOLS, ARSHT & TUNNELL LLP
       June 4, 2008

                                     Gregory W. Werkheiser (No. 3553)
                                     Kelly M. Dawson (No. 4786)
                                     1201 Market Street
                                     P. O. Box 1347
                                     Wilmington, Delaware 19899-1347
                                     Telephone: (302) 351-9229
                                     Fax: (302) 658-3989

                                     -and-

                                     CARVER DARDEN KORETZKY TESSIER FINN
                                     BLOSSMANN & AREAUX, L.L.C.
                                     M. Hampton Carver (LA #4546)
                                     Leann Opotowsky Moses (LA #19439)
                                     1100 Poydras Street, Suite 2700
                                     New Orleans, LA 70163
                                     Telephone: (504) 585-3800
                                     Fax: (504) 585-3801

                                     Co-Counsel for BEPCO, L.P., formerly known
                                     as Bass Enterprises Production Company

2312597.5

# Proposed Certification

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, *et al.*, | ) | Bankr. Case No. 06-10859 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

---

| | | |
|---|---|---|
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-313 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| GlobalSantaFe Corporation, *et al*, | ) | ADV 06-50822 |
| | ) | AP 08-29 |
| Appellees. | ) | |

---

| | | |
|---|---|---|
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-314 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| Santa Fe Minerals Inc., | ) | ADV 06-50822 |
| | ) | AP 08-30 |
| Appellee. | ) | |

---

| | | |
|---|---|---|
| BEPCO LP, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 08-321 (SLR) |
| v. | ) | |
| | ) | Bankruptcy Case No. 06-10859 |
| GlobalSantaFe Corporation, *et al.*, | ) | ADV 06-50822 |
| | ) | AP 08-29 |
| Appellees. | ) | |

---

BEPCO LP,                                    )
                                             )
                                             )
              Appellant,                     )      Civil Action No. 08-322 (SLR)
                                             )
       v.                                    )      Bankruptcy Case no. 06-10859
                                             )      ADV 06-50822
GlobalSantaFe Corporation, *et al.,*         )      AP 08-30
                                             )
              Appellees.                     )
_____     )

## CERTIFICATION TO UNITED STATES
## COURT OF APPEALS FOR THE THIRD CIRCUIT

Upon review of BEPCO, L.P., f/k/a Bass Enterprises Production Company's Emergency Request For Certification For Direct Appeal To The United States Court Of Appeals For The Third Circuit Pursuant to 28 U.S.C. § 158(d)(2) Regarding Bankr. D.I. 291, 292, 323 & 324 And Adv. D.I. 164, 165, 193 & 194 (the "Certification Request"), the Court hereby certifies as follows:[1]

1.     On February 15, 2008, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered its Findings of Fact and Conclusions of Law (Bankr. D.I. 291; Adv. D.I. 164) (the "Opinion" or "Op.") and related Order (Bankr. D.I. 292; Adv. D.I. 165) (the "Order"), which, *inter alia,* denied the Motion of BEPCO, L.P. f/k/a Bass Enterprises Production Company, for Order (I) Dismissing Debtors' Chapter 11 Cases for Bad Faith, Cause Under 11 U.S.C. § 1112(b) and Ineligibility Under 11 U.S.C. § 109, (II) Dismissing or Suspending Debtors' Chapter 11 Cases Under 11 U.S.C. § 305(a)(1), (III) Converting Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Certification Request.

U.S.C. § 1112(b), (IV) Appointing a Trustee Pursuant to 11 U.S.C. § 1104(a), or, (V) Appointing an Examiner Pursuant to 11 U.S.C. § 1104(c) and a related memorandum of law in support thereof (Bankr. D.I. 21 & 22) (together, the "BEPCO Dismissal/Conversion Motion").[2]

2.     On April 16, 2008, the Bankruptcy Court entered its Memorandum Opinion on Reargument (Bankr. D.I. 323; Adv. D.I. 193) (the "Reconsideration Opinion" or "Recon. Op.") and related Order (Bankr. D.I. 324; Adv. D.I. 194) (the "Reconsideration Order," and collectively with the Reconsideration Opinion, the Opinion and the Order, the "Appeal Orders"), which, *inter alia,* denied BEPCO's request in the Motion of BEPCO, L.P. f/k/a Bass Enterprises Production Company For Entry Of An Order (I) Granting Reconsideration, In Part, Of The Court's Opinion And Order, Each Dated February 15, 2008; (II) Upon Reconsideration, (A) Vacating That Portion Of The Opinion And Order Denying The BEPCO Dismissal/Conversion Motion And (B) Amending The Opinion And Order To Grant The Relief Requested In The BEPCO Dismissal/Conversion Motion; And (III) Granting Related Relief (Bankr. D.I. 299; Adv. D.I. 172) (the "BEPCO Reconsideration Motion") to vacate and amend certain portions of the Opinion and Order.[3]

3.     On April 28, 2008, BEPCO timely filed notices of appeal from (a) the Opinion and Order (Bankr. D.I. 329; Adv. D.I. 197) insofar as the Opinion and Order denied the BEPCO Dismissal/Conversion Motion and (b) the Reconsideration Opinion and Order insofar as the Reconsideration Opinion and Order denied BEPCO's request to vacate and amend, in part, the Opinion and Order (Bankr. D.I. 330; Adv. D.I. 198).

---

[2]     Copies of the Opinion and Order are attached as **Exhibit A** hereto.

[3]     Copies of the Reconsideration Opinion and Reconsideration Order are attached as **Exhibit B** hereto.

4.      Leave to appeal the Appeal Orders is not required under 28 U.S.C. § 158(a) or otherwise.

5.      This Certification arises from appeals from final judgments, orders or degrees of the Bankruptcy Court.

6.      The Appeal Orders involve one or more questions of law as to which there are no controlling decisions of the United States Court of Appeals for the Third Circuit or of the Supreme Court of the United States, and involve matters of public importance.

7.      The Appeal Orders involve one or more questions of law requiring resolution of conflicting decisions.

8.      An immediate appeal from the Appeal Orders may materially advance the progress of the Debtors' chapter 11 cases.

9.      Pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8001(f), the appeals of the Appeal Orders are hereby certified for direct review by the United States Court of Appeals for the Third Circuit.


Dated: June __, 2008
        Wilmington, Delaware        _____

                                    UNITED STATES DISTRICT JUDGE

# EXHIBIT A

[Opinion and Order]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, et al., | ) | Case No. 06-10859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re Dkt Nos. 21 & 23** |
| SANTA FE MINERALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50822(KG) |
| | ) | |
| BEPCO, L.P., formerly known as BASS | ) | |
| ENTERPRISES PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| GLOBALSANTAFE CORPORATION, | ) | |
| GLOBALSANTAFE CORPORATE SERVICES | ) | |
| INC. AND ENTITIES HOLDING, INC. | ) | |
| | ) | |
| _____Intervenors._____ | ) | **Re: Dkt No. 3** |

## <u>ORDER</u>

The Court has issued its Findings of Fact and Conclusions of Law ("the Decision")

on the Pending Motions defined in the Decision. For the reasons stated in the Decision, IT

IS ORDERED that:

      1.    The Motion for Preliminary Declaratory and Injunctive Relief (Adv. D.I. 3) is

DENIED.

      2.    The BEPCO Dismissal Conversion Motion (D.I. 22) is DENIED.

3.     The BEPCO Stay Relief Motion (D.I. 23) is GRANTED, subject to the Court's ruling on the appropriate forum.

4.     The Court will conduct a hearing to assist in determining whether the litigation contemplated by the BEPCO Stay Relief Motion and authorized by the Court will proceed in this Court or in a jurisdiction of BEPCO's choosing, and to schedule the proceedings on BEPCO's Alter Ego Claims and the Plan.

Dated: February 15, 2008

_____
KEVIN GROSS, U.S.B.J.

2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, et al., | ) | Case No. 06-10859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Re Dkt. Nos. 21& 23** |
| SANTA FE MINERALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50822(KG) |
| | ) | |
| BEPCO, L.P., formerly known as BASS | ) | |
| ENTERPRISES PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| GLOBALSANTAFE CORPORATION, | ) | |
| GLOBALSANTAFE CORPORATE SERVICES | ) | |
| INC. AND ENTITIES HOLDING, INC. | ) | |
| | ) | |
| Intervenors. | ) | **Re Dkt No. 3** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BY:   KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE

Dated:     February 15, 2008

## COUNSEL

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street
7th Floor
Wilmington, DE 19801

- and -

Marnie E. Simon, Esq.
John C. Kilgannon, Esq.
Stevens & Lee, P.C.
1818 Market Street
29th Floor
Philadelphia, PA 19103

*Counsel for Debtors*
*and Debtors in Possession*

Gregory Werkheiser, Esq.
Kelly M. Dawson, Esq.
Morris, Nichols, Arsht
& Tunnel LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

- and -

M. Hampton Carver, Esq.
Stephen Rose, Esq.
Leann Opotowsky Moses, Esq.
Carver, Darden, Koretzky,
Tessier, Finn, Blossman &
Areaux, LLC
1100 Poydras Street, Ste. 2700
New Orleans, LA 70163

*Counsel for Defendant*

Francis A. Monaco Jr., Esq.
Kevin J. Mangan, Esq.
Womble Carlyle Sandridge
& Rice PLLC
222 Delaware Avenue
15th Floor
Wilmington, DE 19801

- and -

Philip Eisenberg, Esq.
Locke Liddell & Sapp, LLP
3400 JPMorgan
Chase Tower
600 Travis
Houston, TX 77002

*Counsel for Intervenors*

The Debtors are 15375 Memorial Corporation ("**Memorial**") and Santa Fe Minerals, Inc. ("**Santa Fe**"). Debtors commenced their Chapter 11 bankruptcy cases on August 16, 2006 ("**the Bankruptcy Cases**"). On September 8, 2006, Santa Fe brought an adversary proceeding ("**the Adversary Proceeding**") against BEPCO, L.P., formerly known as Bass Enterprises Production Company ("**BEPCO**"). The parties' dispute arose when Debtors filed for bankruptcy shortly before a trial was scheduled to begin in which Debtors and BEPCO were co-defendants. The bankruptcy resulted in Debtors being dismissed from the litigation and BEPCO being faced with all of the liability. BEPCO therefore challenged the validity of the bankruptcy and sought leave of the Court to proceed against Debtors and related entities. The Court is issuing its Findings of Fact and Conclusions of Law following the trial held on October 19, 2006, and September 17-18, 2007 ("**the Trial**").

## I. THE PENDING MOTIONS

The pending motions ("**the Pending Motions**") include the following: (a) the Motion for Preliminary Declaratory and Injunctive Relief and a related memorandum of law in support thereof (Adv. D.I. 3 & 4), filed by Santa Fe (together, "**the Injunction Motion**"); (b) the Motion of BEPCO, L.P. f/k/a Bass Enterprises Production Company, for Order (I) Dismissing Debtors' Chapter 11 Cases for Bad Faith, Cause Under 11 U.S.C. § 1112(b) and Ineligibility Under 11 U.S.C. § 109, (II) Dismissing or Suspending Debtors' Chapter 11 Cases Under 11 U.S.C. § 305(a)(1), (III) Converting Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(b), (IV) Appointing

2

a Trustee Pursuant to 11 U.S.C. § 1104(a), or, (V) Appointing an Examiner Pursuant to 11 U.S.C. § 1104(a) and a related memorandum of law in support thereof (D.I. 21 & 22), filed by BEPCO (together, **"the BEPCO Dismissal/Conversion Motion"**); and (c) the Motion for Modification of the Automatic Stay Under 11 U.S.C. § 362 and a related memorandum of law in support thereof (D.I. 23 & 26), filed by BEPCO (**"the BEPCO Stay Relief Motion"**).

In a motion to shorten (D.I. 25), BEPCO asked the Court to consider the BEPCO Dismissal/Conversion Motion and the BEPCO Stay Relief Motion no later than October 20, 2006. BEPCO sought the expedited ruling because BEPCO's Motion to Reinstate in the litigation captioned *William M. Tebow, et al., v. Bradex Oil & Gas, Inc., et al.*, Docket No. 2005-7728 pending in the 12th Judicial District Court for the Parish of Avoyelles in the State of Louisiana (**"the Tebow Action"**) was scheduled to be heard on October 20, 2006. BEPCO wanted the Court to whether BEPCO was able to pursue its claims against the Debtors and the GSF Entities in connection with the original trial of the Tebow Action. The The Court scheduled the BEPCO Dismissal/Conversion Motion to be considered on October 19, 2006, with the remaining Motions to be considered at a two day hearing initially scheduled for the first week in December 2006.

On October 19, 2006, the hearing was commenced to consider, among other things, the BEPCO Dismissal/Conversion Motion. At the conclusion of that hearing, the Court took the BEPCO Dismissal/Conversion Motion and arguments presented in connection therewith

3

under advisement. (B-Exh. 230 at 96). Thereafter, the Court decided to defer its ruling because a more complete record was necessary. (B-Exh. 231 at 3-4). Accordingly, on November 22, 2006, this Court entered an order scheduling the entirety of the Pending Motions to be considered at a hearing to be convened in January 2007 (Adv. D.I. 45).

On December 29, 2006, the GSF Entities (defined below) filed the Motion of GlobalSantaFe Corporation, GlobalSantaFe Corporate Services Inc., and Entities Holdings, Inc., to Dismiss BEPCO, L.P.'s F/K/A Bass Enterprises Production Company, Motion for Modification of the Automatic Stay Under 11 U.S.C. Section 362 (D.I. 100) ("the **GSF Motion to Dismiss**") in opposition to the BEPCO Stay Relief Motion. The GSF Entities argued that the Court should deny the BEPCO Stay Relief Motion based on BEPCO's alleged failure to adduce adequate evidence in support of the claims BEPCO asserted against the GSF Entities on the basis of alter ego, veil piercing, single business enterprise and similar theories of recovery.

On January 9, 2007, the Court entered the Order Regarding Discovery and Adjourning Evidentiary Hearing which, *inter alia*, held the GSF Motion To Dismiss in abeyance until the hearing on the Pending Motions (Adv. D.I. 49). Reaffirming its ruling, on February 7, 2007, this Court entered the Order Regarding Discovery and Related Issues (Adv. D.I. 84) which stated, in pertinent part, that "[f]urther briefing and decision on GlobalSantaFe's Motion to Dismiss is hereby deferred until after the hearing and post-hearing briefing." (B-Exh. 147 at ¶ 8).

4

In addition to the Pending Motions and the GSF Motion To Dismiss, on June 25, 2007, the Debtors' circulated and later filed a summary judgment motion (D.I. 243) ("**the Summary Judgment Motion**"). The Pending Motions, as defined, are the subject of the Court's rulings.

## II. THE PARTIES[1]

### A. The Debtors

1.    15375 Memorial Corporation, f/k/a GlobalSantaFe
      Holding Company, f/k/a Santa Fe (US Holdings) Inc.

Memorial, formerly known as Santa Fe (US Holdings) Inc. and GlobalSantaFe Holdings Company, is a Delaware corporation and the immediate parent of SantaFe

---

[1]  The Court will refer to the record using the following abbreviations:

> "**Jt. Pre-Tr. Or.**" refers to the Final Joint Pre-Trial Order With Respect To (I) Motion For Preliminary And Injunctive Relief (Adversary D.I. 3); (II) Bass Motion To Dismiss And For Other Relief (D.I. 21); And (III) Bass Motion For Modification Of The Automatic Stay (D.I. 23) (D.I. 240; Adv. D.I. 128) attached to the Appendix To BEPCO, L.P., F/K/A Bass Enterprises Production Company's Post-Trial Brief (the "**Appendix**") as Exhibit A.

> "**10/19/06 Tr.**" refers to the transcript of the Trial on October 19, 2006.

> "**9/17/07**" refers to the transcript of the Trial on September 17, 2007.

> "**9/18/07**" refers to the transcript of the Trial on September 18, 2007.

> "**B-Exh.___**" refers to a BEPCO Trial Exhibit and the exhibit number.

> "**D-Exh. ___**" refers to a Debtors/GSF Entities Trial Exhibit and the exhibit number.

Minerals, Inc. ("**Santa Fe**"). (B-Exh. 118; B-Exh. 120 at ¶ 3; B-Exh. 162; Jt. Pre-Tr. Or. at 6; 9/17/07 Tr. at 49, 111). In June 2001, Memorial voluntarily dissolved. (B-Exh. 228 at 5, 36; B-Exh. 230 at 64; B-Exh. 241; Jt. Pre-Tr. Or. at 6; 9/17/07 Tr. at 113-14). The dissolution was later revoked in June 2004 "under the advice of counsel in litigation." (B-Exh. 228 at 5, 36; B-Exh. 230 at 65; B-Exh. 241; Jt. Pre-Tr. Or. at 6; 9/17/07 Tr. at 114). Memorial is now a holding company with no employees and engages in no business other than to act as the sole shareholder of Santa Fe. (B-Exh. 128; B-Exh. 228 at 5; 9/17/07 Tr. at 113, 115). GlobalSantaFe Corporate Services Inc. ("**GSFCSI**"), other affiliate entities and outside vendors provide Memorial with all support services, including but not limited to, legal, tax, and purchasing. (Jt. Pre-Tr. Or. at 7; 9/17/07 Tr. at 111).

    2.    <u>Santa Fe Minerals, Inc.</u>

Debtor Santa Fe was a corporation organized under the laws of the state of Wyoming until it dissolved in December 2000 pursuant to a non-judicial Wyoming statutory dissolution procedure. (B-Exh. 120 at ¶ 3; B-Exh. 179 at ¶ 7; B-Exh. 228 at 10, 17, 38-39; B-Exh. 230 at 37; Jt. Pre-Tr. Or. at 7-8). Prior to its dissolution, Santa Fe was an indirect, wholly owned subsidiary of SantaFe International Corporation (which later merged into GSF Corp. (as defined below)). (B-Exh. 228 at 10, 17, 38-39; Jt. Pre-Tr. Or. at 7; 9/17/07 Tr. at 119). Santa Fe's business was oil and gas exploration and related activities. (B-Exh. 228 at 10, 17, 38-39; Jt. Pre-Tr. Or. at 7; 9/17/07 Tr. at 119). Santa Fe's dissolution means that it is able to act only through its sole shareholder, Memorial, in furtherance of winding up its remaining

business. (B-Exh. 162; B-Exh. 165; B-Exh. 228 at 10; B-Exh. 230 at 32, 34; 9/17/07 Tr. at 47, 49; Jt. Pre-Tr. Or. at 8). Santa Fe currently has no officers, directors or employees and engages in no business. (B-Exh. 228 at 10, 12, 26, 48; B-Exh. 230 at 32; Jt. Pre-Tr. Or. at 7). Santa Fe's defunct status is undisputed and a matter of public record in these cases. Santa Fe's Monthly Operating Reports since the outset of these cases has contained the following statement (or one similar to it) in lieu of otherwise required financial statements and other information:

> Debtor is a dissolved Wyoming corporation and as such it operates no business. Debtor has no employees, property, and maintains no bank accounts of any sort. In addition therefore, no financial statements are prepared.

(B-Exh. 166, 169, 170, 171, 172, 173, 174, 175, 176, 177, 177A, 177B & 177C).

Both Debtors identify 15375 Memorial Drive, Houston, Texas, as their address, which is the U.S. headquarters of GSF Corp. and other related entities. (B-Exh. 118; B-Exh. 162; B-Exh. 228 at 25-26; Jt. Pre-Tr. Or. at 8; 9/17/07 Tr. At 115). Neither Debtor actually has offices at this address or at any other location. (B-Exh. 228 at 25-26; 9/17/07 Tr. at 115-16).

## B. The GSF Entities

### 1.    GlobalSantaFe Corporation

GlobalSantaFe Corporation ("**GSF Corp.**"), a Cayman Islands corporation, is the ultimate parent in the GlobalSantaFe family of companies. (B-Exh. 181 at 2). The GlobalSantaFe entities are one of the world's largest offshore oil and gas drilling contractors and a leading provider of drilling services. (9/17/07 Tr. at 99). In 2006, GSF Corp. reported

net income on a consolidated basis in excess of one billion dollars. (B-Exh. 129 at 7; 9/17/07 Tr. at 96, 98).

2.    Entities Holdings, Inc.

Entities Holdings, Inc. ("**EHI**") is a wholly owned, direct subsidiary of GSF Corp. and is the parent and sole shareholder of Memorial. (B-Exh. 118; B-Exh. 128; B-Exh. 228 at 26; B-Exh. 230 at 34; Jt. Pre-Tr. Or. at 8; 9/17/07 Tr. at 102-03). EHI has several additional subsidiaries (including, but not limited to, SantaFe Braun) with assets of material value. (9/17/07 Tr. at 102-03). EHI has no employees and is a holding company. (B-Exh. 228 at 26; B-Exh. 230 at 71; 9/17/07 Tr. at 106).

3.    GlobalSantaFe Corporate Services Inc.

GSFCSI is a wholly-owned, indirect subsidiary of GSF Corp. and is the principal provider in the United States of corporate services to other entities in the GlobalSantaFe corporate family. (B-Exh. 230 at 34; Jt. Pre-Tr. Or. at 8; 9/17/07 Tr. at 107, 108). GSFCSI employs approximately 400 to 500 people worldwide. (9/17/07 Tr. at 109). GSFCSI maintains the books and records of the Debtors. (B-Exh. 228 at 12; 9/17/07 Tr. at 116).

C. David E. Faure and Others

Mr. Faure, identified as a representative of the Debtors in connection with these cases, has many roles within the GlobalSantaFe corporate family. Mr. Faure is currently employed by GSFCSI as vice president, assistant general counsel and assistant secretary. (B-Exh. 228 at 37; B-Exh. 230 at 35, 71; Jt. Pre-Tr. Or. at 9; 9/17/07 Tr. at 44). In his capacity as an

8

employee of GSFCSI, Mr. Faure has provided and continues to provide legal services to EHI, primarily assisting it with the defense of litigation. (9/17/07 Tr. at 106). In addition, Mr. Faure also serves as vice president and assistant secretary of both Memorial (B-Exh. 230 at 32; B-Exh. 241; 9/17/07 Tr. at 44) and EHI (B-Exh. 228 at 37; B-Exh. 230 at 35, 71; Jt. Pre-Tr. Or. at 9; 9/17/07 Tr. at 44-45, 104, 106).

Mr. Faure's superior is James L. McCullough ("**Mr. McCullough**"), the senior vice president and general counsel of GSF Corp. (B-Exh. 230 at 72). Mr. Faure both reports to and takes direction from Mr. McCullough. (B-Exh. 230 at 72; 9/17/07 Tr. at 93). Before the Petition Date, Mr. Faure sought legal counsel from Mr. McCullough relating to Memorial and has consulted with Mr. McCullough during the pendency of the Tebow Action and when preparing to place Debtors into bankruptcy. (Jt. Pre-Tr. Or. at 9; 9/17/07 Tr. at 93-94). Mr. McCullough authorized the filing of the Bankruptcy Case. (9/17/07 Tr. at 94).

Mr. Faure is charged with "marshalling assets, dealing with the liabilities, [and] working on the bankruptcy case for Debtors." (9/17/07 Tr. at 45). Mr. Faure was given responsibility for marshalling the assets and liabilities of the Debtors at least 18 months prior the Petition Date. (B-Exh. 230 at 36).

Mr. Faure testified that it would fall within his job description to oversee the process of trying to recover funds from various GSF Entities for the benefit of the Debtors' estate, including the recovery of those funds that were upstreamed to EHI and Memorial after Santa Fe's dissolution. (B-Exh. 230 at 75-76). During the initial phase of his investigation of

potential claims against the GSF Entities, Mr. Faure testified regarding the viability of those claims and stated that he does not think they "are very good claims." (B-Exh. 230 at 70-71). Mr. Faure further testified that filing a lawsuit against GSF Corp. on behalf of the Debtors to facilitate the return of upstreamed funds would jeopardize his job. (B-Exh. 230 at 75). Other individuals connected with the Debtors also have other roles within the GlobalSantaFe corporate family. As of the Petition Date and currently, the officers of Memorial are as follows: Benjamin W. Bollinger, Vice President, Sales and Contracts; David E. Faure, Vice President and Assistant Secretary; L. Craig Williams, Treasurer and Controller; Margaret Fitzgerald, Secretary; Michael D. Garvin, President; and Peggy D. Jennings, Assistant Secretary ("**Memorial's Officers**"). (B-Exh. 128; B-Exh. 241; Jt. Pre-Tr. Or. at 7). Each of Memorial's Officers also holds an officer position in at least one other company in the GlobalSantaFe corporate family. (B-Exh. 228 at 25, 48). For example, all of Memorial's Officers are also officers of EHI and GSFCSI. (Jt. Pre-Tr. Or. at 7; 9/17/07 Tr. at 110).[2]

As of the Petition Date and currently, the directors of Memorial are Jon A. Marshall ("**Mr. Marshall**"), W. Matt Ralls ("**Mr. Ralls**") and Cheryl D. Richard ("**Ms. Richard**"). (9/18/07 Tr. at 8). Mr. Marshall, Mr. Ralls and Ms. Richards all serve as officers of GSF Corp. (B-Exh. 241; Jt. Pre-Tr. Or. at 7). Mr. Marshall is the president and chief executive officer of GSF Corp. (9/18/07 Tr. at 8). Mr. Ralls is the executive vice president and chief operating officer of GSF Corp. (9/18/07 Tr. at 8). Ms. Richard is the senior vice president

---

[2]    Entities and GSFCSI do have officers within their organizations in addition to Memorial's Officers. (Jt. Pre-Tr. Or. at 7).

of human resources for GSF Corp. (9/18/07 Tr. at 8).  Certain directors of EHI are also

officers of GSF Corp. (9/17/07 Tr. at 105).

### D.  BEPCO, L.P., f/k/a Bass Enterprises Production Company

BEPCO, formerly known as Bass Enterprises Production Co. and Richardson Oils,

Inc., is in the chain of title to the 1938 Mineral Lease (as defined below) under which oil

exploration was first conducted in Avoyelles Parish, Louisiana. (B-Exh. 1; B-Exh. 5; B-Exh.

54; B-Exh. 55).  On October 15, 1938, Sid W. Richardson obtained a mineral lease (the

**"1938 Mineral Lease"**) on certain parcels of land (the **"Tebow Property"**) in Avoyelles

Parish, Louisiana. (B-Exh. 1).  The Estate of Sid W. Richardson assigned the majority of its

interest in the 1938 Mineral Lease to Richardson Oils, Inc. in 1962. (B-Exh. 5).  On October

22, 1969, Richardson Oils, Inc., amended its Articles of Incorporation to change its name to

Bass Enterprises Production Co. (B-Exh. 54 at 00201-00203).  On July 25, 2005, Bass

Enterprises Production Co., a Texas corporation, was merged with and into surviving

corporation Bass Enterprises Production Co., a Delaware corporation. (B-Exh. 55 at 0123-

0124).  On July 25, 2005, Bass Enterprises Production Co. converted to a limited partnership

and changed its name to BEPCO, L.P.  (B-Exh. 55 at 0117-0119).  Through this series of

transactions, BEPCO is in the chain of title to the 1938 Mineral Lease.

11

## III. THE DISSOLUTION OF SANTA FE

### Santa Fe's Assets Are Liquidated And
### Upstreamed To Its Non-Debtor Affiliates

Santa Fe's physical assets were sold or disposed of long before the Bankruptcy Cases were commenced. (B-Exh. 228 at 39; B-Exh. 230 at 62). Mr. Fauré testified that the proceeds of all of Santa Fe's assets were upstreamed to the GSF Entities or other of the Debtors' affiliates by December 2000, when Santa Fe's dissolution became effective. (B-Exh. 228 at 39; B-Exh. 230 at 90, 93). Santa Fe dissolved in December 2000 pursuant to a non-judicial Wyoming statutory dissolution procedure. (Jt. Pre-Tr. Or. at 8). The Debtors' understanding was that under the Wyoming statute "after [the notice of dissolution] had been published for two years, any claims which had not been brought to the attention of the company in accordance with the publication notice would be time-barred." (9/17/07 Tr. at 120). On December 1, 2000, Santa Fe's shareholder – Memorial – executed an Agreement and Plan of Liquidation. (Jt. Pre-Tr. Or. at 8). Santa Fe filed its Articles of Dissolution with the Wyoming Secretary of State on December 8, 2000. Santa Fe published the notice of dissolution on August 4, 2006, nearly six (6) years later. (Jt. Pre-Tr. Or. at 8; 9/17/07 Tr. at 119). The notice of dissolution could have been given prior to August 4, 2006. The delay resulted in a "technical glitch" in the dissolution process. (B-Exh. 230 at 38; 9/17/07 Tr. at 49.)

## III.  THE TEBOW ACTION AND RELATED MATTERS

### A.  Background

Santa Fe and BEPCO are in the chain of title to the 1938 Mineral Lease. (B-Exh. 134 at ¶ 11).  On February 1, 1964, Richardson Oils, Inc., assigned all interest in the 1938 Mineral Lease to Chenola Oil Corporation. (B-Exh. 6).  Chenola Oil Corporation then transferred the 1938 Mineral Lease to Chenola Corporation of Louisiana, Inc. (B-Exh. 7). As a condition to both the assignment and transfer, Chenola Oil Corporation and Chenola Corporation of Louisiana, Inc. promised to assume and perform "all the obligations of Assignor or its predecessors in title required to be performed under the oil, gas and mineral leases described in Exhibit A, or by any statute, law or governmental regulation." (B-Exh. 6; B-Exh. 7 at 2145).

Chenola Corporation of Louisiana, Inc. held the 1938 Mineral Lease until 1974, when it assigned the lease to Andover Oil Company.  In the transfer document, Andover Oil Company agreed, in pertinent part, that "[t]his assignment incorporates and is made subject to any and all burdens and obligations applicable to the Leases herein assigned or the land covered by such leases recorded in Avoyelles and Rapides Parishes on June 1, 1974." (B-Exh. 8 at 2154).  As the assignment of the 1938 Mineral Lease to Andover Oil Company incorporated the obligations of all prior recorded documents, Andover Oil Company became liable to Richardson Oils, Inc. (now BEPCO) to perform the obligations arising under the 1938 Mineral Lease. (B-Exh. 8).

Through a series of mergers completed in July – August 1982, Santa Fe acquired and became the successor-in-interest to Andover Oil Company. (9/18/07 Tr. at 33; B-Exh. 110 at R.04 046 - R.04050, R.04073-04086). As a result, Santa Fe acquired all obligations of Andover Oil Company owed to BEPCO. From 1974 to 1990, both Andover Oil Company and Santa Fe, as successor-in-interest to Andover Oil Company, operated oil wells on the Tebow Property. (9/18/07 Tr. at 34; B-Exh. 12).

On April 18, 2005, various plaintiffs (the "**Tebow Plaintiffs**") initiated the Tebow Action naming BEPCO, Santa Fe, and a number of others as defendants. (B-Exh. 14). Bass Enterprises Production Company and Santa Fe were the only entities in the chain of title to the 1938 Mineral Lease named as defendants by the Tebow Plaintiffs. (B-Exh. 14 at 1062-1063).

The Tebow Plaintiffs made several allegations of which the Debtors had knowledge. The Tebow Plaintiffs alleged that: water produced from oil wells was disposed of in unlined earthen pits on their property, this water contained salt and dangerous minerals, metals, and radioactive materials, and the contamination migrated both horizontally and vertically into the surrounding soil and ground water. (9/18/07 Tr. at 14-15; B-Exh. 14 at ¶ 8-12, 19). The Tebow Plaintiffs further alleged that some of the contamination had entered the drinking water aquifer. (9/18/07 Tr. at 20; B-Exh. 25 at 1117).

The Tebow Plaintiffs retained two experts – Greg Miller and Austin Arabie – to document the extent of the contamination of the Tebow Property (the "**Expert Reports**"). (9/18/07 Tr. at 15; B-Exh. 19; B-Exh. 22). The Debtors knew that the Expert Reports

14

indicated that: the worst contamination on the Tebow Property occurred in the East Pit area – an area located on the 1938 Mineral Lease for which both BEPCO and Santa Fe were in the chain of title. (9/18/07 Tr. at 19-20; B-Exh. 104; B-Exh. 134); the closure of the East Pit area placed contaminated sludges into the 10-foot water-bearing zone and also contaminated the deep drinking water aquifer. (B-Exh. 19 at 02946; B-Exh. 22 at 03082-03083, 03090-03091). The Eddie Mayo area is also on the 1938 Mineral Lease. (9/18/07 Tr. At 19-20; B-Exh. 104; B-Exh. 134).

Santa Fe knew that the Expert Report and historic aerial photographs of Greg Miller and an additional expert report and historical aerial photographs of Michael Pisani[3] clearly state that the East Pit was constructed after 1965 and, therefore, after BEPCO's 1964 assignment of the 1938 Mineral Lease to Chenola Oil Corporation. Chenola Oil Corporation, Chenola Corporation of Louisiana, Inc., Andover Oil Company, and Santa Fe all utilized the East Pit. If the Expert Report is correct, BEPCO never used the East Pit. (B-Exh. 6; B-Exh. 22 at 3082; D-Exh. 34 at 4).

Santa Fe, not BEPCO, was responsible for closing the East Pit which, as Debtors knew, the Expert Reports concluded resulted in the placement of contaminated sludges into the 10-foot water-bearing zone and caused contamination of the drinking water aquifer.

---

[3]     BEPCO and Santa Fe jointly hired and paid experts to evaluate the property where they were both leaseholders. Their primary environmental expert was Michael Pisani. (9/18/07 Tr. at 21, 27).

(9/18/07 Tr. at 20; B-Exh. 22 at 3090; D-Exh. 34 at 4).[4] . Santa Fe knew that the Expert Reports showed that it, not BEPCO, was to blame for pollution around the East Pit. (9/18/07 Tr. at 20, 23, 27; B-Exh. 19 at 02946; B-Exh. 22 at 03082-03083, 03090- 03091; D-Exh. 34 at 4).

The Debtors were aware that the Tebow Plaintiffs were seeking $320 million from Santa Fe and BEPCO for remediation of the East Pit and Eddie Mayo areas. (9/18/07 Tr. at 34). Debtors were also aware that while the Expert Report of Austin Arabie did not break down damages between the two areas, in Mr. Arabie's opinion it was the East Pit that had allegedly caused pollution in the drinking water aquifer necessitating $189 million in remediation costs. (B-Exh. 19 at 02946).

Faced with such serious allegations and damage estimates in the Tebow Action, BEPCO, Santa Fe and the other defendants discussed a joint defense agreement (the "**JDA**"). (9/18/07 Tr. at 22; B-Exh. 30). A draft JDA provided that the Defendants would share expert fees and refrain from suing each other. (9/18/07 Tr. at 22, 23, 26; B-Exh. 30). The draft JDA was distributed by Benn Vincent of the Kean Miller firm which represented both ARCO/BP and Santa Fe. Mr. Vincent himself represented ARCO/BP. Although the JDA was not formally executed, BEPCO, Santa Fe and the other defendants in the Tebow Action conducted themselves in accordance with the terms set forth in the JDA, at least insofar as,

---

[4] The authors of the Expert Reports did not testify at the Trial. Therefore, the Expert Reports were admitted at the Trial for the limited purpose of establishing Debtors' state of mind and not for the truth of the findings and opinions stated therein.

none of the defendants in the Tebow Action, including BEPCO and Santa Fe, initiated

lawsuits against one another. (9/18/07 Tr. at 23, 27).

## B. The Automatic Stay

When the Debtors filed their bankruptcy petitions, most of the trial preparation in the

Tebow Action had taken place. As of the Petition Date, trial in the Tebow Action was

scheduled to commence on October 11, 2006, with the deadline for fact discovery and expert

discovery scheduled for June 15, 2006 and August 11, 2006, respectively. (B-Exh. 16 at 4-5).

BEPCO and Santa Fe had participated in numerous depositions. (9/18/07 Tr. at 27-29).

The Debtors were aware that Santa Fe would avoid liability in the Tebow Action by

seeking protection under the provisions of the Bankruptcy Code. (B-Exh. 14 at ¶ 30). The

complaint filed by the Tebow Plaintiffs in the Tebow Action states, in pertinent part:

> Plaintiffs herein expressly do not pursue any defendants or
> claims which have been discharged in bankruptcy, and if a party
> or parties has or intends to file for bankruptcy concerning any of
> the claims alleged herein, it is the express intention of Plaintiffs
> not to pursue those claims or party or parties in this action, even
> if such party or parties has been inadvertently named as a
> defendant above.

(B-Exh. 14 at ¶ 30).

One day after the Petition Date, the Tebow Plaintiffs dismissed Santa Fe without

prejudice from the Tebow Action upon an *ex parte* motion by the Tebow Plaintiffs. (B-Exh.

39). BEPCO remained as a defendant in the Tebow Action.

On August 22, 2006, BEPCO filed its Exceptions and Answer to Third Supplemental

And Amending Petition and Third Party Petition (the "**Third Party Complaint**") in the

17

Tebow Action. (B-Exh. 40). The Third Party Complaint did not name Debtors. BEPCO sought, *inter alia*, (i) to assert alter ego claims against the GSF Entities, (ii) to proceed by direct action against certain of the insurers of Santa Fe and/or the GSF Entities, and (iii) to pursue cross and third-party claims against certain other parties unaffiliated with the Debtors or the GSF Entities. (B-Exh. 40). On August 22, 2006, the Louisiana State Court granted the Tebow Plaintiff's motion and dismissed the Third Party Complaint without prejudice as BEPCO had not first sought leave from the Louisiana State Court to file the Third Party Complaint. (B-Exh. 41).

On August 25, 2006, BEPCO filed its Motion to Reinstate Third Party Demand Filed by Bass Enterprises Production Company And Alternatively For Leave To File Third Party Demand And To Upset Trial Date and a memorandum in support thereof (collectively, the "**Motion to Reinstate**"). (B-Exh. 42). BEPCO filed its Motion to Reinstate without first seeking or obtaining relief from stay from this Court. On August 30, 2006, BEPCO's counsel in the Tebow Action received by facsimile transmission Debtors' counsel's August 30, 2006, letter accusing BEPCO of violating the automatic stay by attempting to pursue the alter ego claims against the GSF Entities. (B-Exh. 43).

On September 1, 2006, BEPCO filed a notice of removal of the Tebow Action (the "**Removal Notice**") to the United States District Court for the Western District of Louisiana (the "**Louisiana Federal Court**"). (B-Exh. 56). In the Removal Notice, BEPCO acknowledged the receipt of the August 30, 2006 letter from Santa Fe's bankruptcy counsel.

18

(B-Exh. 56 at 2). BEPCO also moved the Louisiana Federal Court to transfer venue of the Tebow Action to the United States District Court for the District of Delaware (the "**Motion to Transfer**"). (B-Exh. 57).

In remanding the Tebow Action to the Louisiana State Court, the Louisiana Federal Court ruled that the resolution of the Tebow Action would not alter Santa Fe's "rights, liabilities, options, or freedom of action". (B-Exh. 60 at 4-5).

On October 19, 2006, this Court held a hearing at which, *inter alia,* BEPCO requested "interim" relief from stay to proceed with the Motion to Reinstate, which was then scheduled to be heard by the Louisiana State Court the following day. (B-Exh. 230 at 127). This Court denied BEPCO's request for interim relief from stay.

Trial in the Tebow Action commenced on February 19, 2007. (B-Exh. 45). BEPCO entered into a settlement with the Tebow Plaintiffs before a judgment was rendered. (B-Exh. 50). Under the terms of the settlement agreement (the "**Tebow Settlement Agreement**"), BEPCO agreed to pay $20 million to the Tebow Plaintiffs and to perform certain remedial measures on the Tebow Property. (B-Exh. 50 at 1569-1570). In return, the Tebow Plaintiffs assigned all their claims for property damage to BEPCO. (B-Exh. 50 at 1572-1573). BEPCO has complied with its obligations under the Tebow Settlement Agreement, including making the $20 million payment. (B-Exh. 53).

19

## IV.  BEPCO'S CLAIMS AGAINST THE
## DEBTORS AND THE GSF ENTITIES

### A.  BEPCO's Claims Against SantaFe

BEPCO has asserted a claim against Santa Fe for assignment, contribution and indemnity and contamination of the drinking water. (9/18/07 Tr. at 20; B-Exh. 22 at 3090; D-Exh.34 at 4).  The construction of the East Pit occurred in 1965 and, thus, after BEPCO's 1964 assignment of the 1938 Mineral Lease to Chenola Oil Corporation. (B-Exh. 6; B-Exh. 22 at 3082; D-Exh. 34 at 4).  On April 27, 2007, BEPCO filed a proof of claim against Santa Fe asserting a claim relating to or arising out of the Tebow Action. (B-Exh. 226).  BEPCO's claim is based on its allegations of:  (i) the express or implied assumption of obligations by Santa Fe under the 1938 Mineral Lease covering the Tebow Property; (ii) the negligence and unreasonable and excessive conduct of Santa Fe with respect to the Tebow Property; (iii) the strict liability of Santa Fe with respect to the Tebow Property and (iv) any and all rights conferred to BEPCO pursuant to the Settlement Agreement. (B-Exh. 226).

### B.  BEPCO's Claims Against Memorial and the GSF Entities

BEPCO has asserted claims against Memorial and the GSF Entities based on, *inter alia*, a Wyoming statute, W.S. § 17-16-1407, et seq., authorizing the recovery of distributions made at dissolution and alter ego (and other related) theories.   The claims are based upon BEPCO's allegations that: (a) Memorial, EHI and other entities in the GSF corporate family are liable for the debts of Santa Fe, to the extent they received assets from Santa Fe in connection with Santa Fe's dissolution (B- Exh. 230 at 75), (b) Santa Fe had sold or

20

otherwise monetized all of its physical assets by year-end 1995 (B-Exh. 230 at 62-63), (c) the proceeds of all of Santa Fe's assets were upstreamed to the GSF Entities or other of the Debtors' affiliates and, ultimately, to agents of the Kuwaiti government by December 2000 (B-Exh. 228 at 39; B-Exh. 230 at 90, 93), and (d) Santa Fe's 2000 tax return shows assets worth $1.4 million and $800.5 million in paid-in capital. (B-Exh. 76 at 22012). Debtors concede that $500,000 was upstreamed to EHI, the parent of Memorial and a subsidiary of GSF Corp., either directly or through Memorial[5] and  (B-Exh. 230 at 76, 90; 9/17/07 Tr. at 58).

On April 27, 2007, BEPCO filed a proof of claim against Memorial asserting its right to recover against Memorial as to all obligations arising out of or related to the Tebow Action for which Santa Fe is liable to BEPCO and any and all other rights conferred pursuant to that certain Settlement Agreement by and among the Tebow Plaintiffs and BEPCO in the Tebow Action. (B-Exh. 225).  BEPCO's Claim that Memorial is liable is based on, *inter alia*, (a) Wyoming statute, W.S. § 17-16-1407 et seq. and other rules of law permitting a creditor to recover from those who directly or indirectly have received assets of a dissolved corporation and (b) alter ego, veil piercing, single business enterprise and all other doctrines that would allow BEPCO to disregard Santa Fe as a separate corporate entity. (B-Exh. 225).

---

[5]    Santa Fe and Memorial contend that they cannot determine the exact amount of the assets distributed to Memorial because of the poor state of the records – an unknown number of records were lost or destroyed. (B-Exh. 230 pp. 39-40, 49, 66-67, 90).

21

## V.  THE TIMING OF THE BANKRUPTCY FILINGS

The Debtors' bankruptcy filings were "part of a coordinated strategy to resolve all of the claims against them in existing and future lawsuits." *See* Debtors' Pre-Trial Brief In Connection With Contested Matters Scheduled For Trial On September 17, 2007, (Bankr. D.I. 235) (hereinafter "**Debtors Pre-Trial Brief**") at 8.  A motivation for the filing of the Debtors' bankruptcy cases was to cut off the potential future exposure of the GSF Entities for claims made against the Debtors. (B-Exh. 230 at 86-87).

Santa Fe had hoped to defend itself in litigation by relying on its dissolution as a defense (9/17/07 Tr. at 49, 120), but was concerned that the failure to publish notice would undermine the effectiveness of its dissolution defense. (9/17/07 Tr. at 49, 50, 51).  Debtors determined in the Summer of 2006 that the failure to give proper notice in connection with Santa Fe's dissolution created a risk to Santa Fe's shareholders for its liabilities in litigations, including the Tebow Action.  (9/18/07 Tr. at 49-50).

The Tebow Plaintiffs informed Santa Fe in June 2006 that they would pursue Santa Fe's parent entities. (B-Exh. 230 at 69-70; 9/17/07 Tr. at 99).  BEPCO's counsel did likewise. (9/17/07 Tr. at 134-35).

Debtors filed the Bankruptcy Cases shortly after GlobalSantaFe Corp disclosed in a filing with the Securities and Exchange Commission that experts retained by the Tebow Plaintiffs had issued a report claiming that over $300 million would be required to properly remediate damages to their property in an area operated by Santa Fe and "another codefendant . . . ." (Jt. Pre-Tr. Or. at 12; B-Exh. 73 at 01027).  Its SEC filing further stated

22

that "[t]he plaintiffs and a co-defendant" had "threatened to add GlobalSantaFe Corporation as a defendant in the lawsuit under the 'single business enterprise' doctrine contained in Louisiana law." (Jt. Pre-Tr. Or. at 12; B-Exh. 73 at 01027).

On August 8, 2006, one week before the Bankruptcy Cases commenced, Memorial executed that certain Subordinated Revolving Demand Note (the "**Demand Note**"). (B-Exh. 219, Ex. A; B-Exh. 228 at 30-31; Jt. Pre-Tr. Or. at 78). The Demand Note was structured as a revolving credit line from EHI, ostensibly with up to $500,000 in availability. (B-Exh. 219, Ex. A; 9/17/07 Tr. at 123). Memorial, made only one draw prior to the bankruptcy filing in the amount of $100,000. (B-Exh. 219, Ex. A; B-Exh. 228 at 30-31; 9/17/07 Tr. at 123). Repayment of indebtedness under the Demand Note is deeply subordinated. The Demand Note provides that any indebtedness evidenced by the Demand Note is "subordinate and subject to the prior payment, in full, of all principal and interest obligations of [Memorial] to non-affiliates . . . ." Demand Note § 3.1. The Demand Note provides as follows:

> As consideration for the issuance of this Note, [Memorial] agrees that (i) it accepts all liabilities existing or arising from the activities of Santa Fe Minerals, Inc. ("Subsidiary"), a dissolved subsidiary of [Memorial]; (ii) it is not a single business enterprise with Lender, GlobalSantaFe Corporation, or any affiliate of GlobalSantaFe Corporation; and (iii) it will defend and indemnify Lender from any claims, whether based on an alter-ego, single business enterprise or other principle, relating to Subsidiary's operations. If Maker is unable to fulfill this agreement or otherwise breaches its obligations hereunder, Maker will immediately repay in full the amount of the outstanding principal under this Note together with accrued and unpaid interest therein within three Business Days.

23

Demand Note § 5.1.

Mr. Faure negotiated and signed the Demand Note on behalf of Memorial. Mr. Faure testified that it was his understanding at the time he entered into the Demand Note that clause (i) in section 5.1 of the Demand Note was intended to ensure that Memorial assumed the debts of Santa Fe and never got transferred to EHI. (9/17/07 Tr. at 124). Mr. Faure explained that this provision functioned to ensure that "whatever liabilities remained and existed were kept on the Memorial side of this transaction." (9/17/07 Tr. at 124-25).

Mr. Faure also confirmed it was his understanding at the time he executed the Demand Note on behalf of Memorial that clause (ii) of section 5.1 of the Demand Note functioned as stipulating that Memorial had no claim available to pursue against EHI, GSF Corp. or GSF Corp.'s affiliates based on a single business enterprise theory. (9/17/07 Tr. at 124). Mr. Faure confirmed that it was his understanding at the time he executed the Demand Note on behalf of EHI that clause (iii) of section 5.1 of the Demand Note provided for Memorial to defend and indemnify EHI from any claim related to Santa Fe's operations, whether based on alter ego, single business enterprise or other theories. (9/17/07 Tr. 125).

Immediately prior to commencement of the Bankruptcy Cases Memorial obtained $100,000 under the Subordinated Revolving Demand Note between GlobalSantaFe Holding Company and EHI, dated August 8, 2006, in the principal sum of $500,000 (the "**Note**") to fund bankruptcy costs. Ernst & Young believed Santa Fe may have distributed $500,000 to Memorial at the time of Santa Fe's dissolution. (Stipulated Fact 78; 10/19/06 Tr. at 66; 9/17/07 Tr. at 122 & 123; 9/18/07 Tr. at 84 & 85). Included in Memorial's Schedule F is the

24

unsecured nonpriority claim of EHI in the amount of $100,000 relating to the loan from EHI to Memorial pursuant to the Note. (Stipulated Fact 86). Memorial had no cash before it executed the Note and, given their financial and operational status, Debtors could not obtain funding from any source other than the GlobalSantaFe Entities. (Stipulated Fact 78; 10/19/06 Tr. at 88; 9/17/07 Tr. at 125 & 126).

The terms of the Note were negotiated between Memorial and EHI by Drew Baker, an attorney employed by GSFCSI, who was counsel for EHI, and Mr. Faure. (9/17/07 Tr. at 126, 127 & 128). Section 5.1 was included in the Note so that EHI and other affiliates would not be prejudiced in the face of assertions being made by the Tebow Plaintiffs that GSFCSI's designating Mr. Faure and otherwise assisting in the defense of the Tebow Action rendered such entities liable as a single business enterprise. (9/17/07 Tr. at 127; 9/18/07 Tr. at 85 & 86). Mr. Faure's due diligence – including review of all the available books and records, resolutions and corporate minutes of Memorial and EHI and consultation with outside counsel – led him to conclude that Memorial was not a single business enterprise with any of the other companies. (9/17/07 Tr. at 127 & 128).

After commencement of the Bankruptcy Cases, Debtors discovered Memorial's 2000 federal tax return which suggested that Santa Fe's distribution to Memorial on dissolution was $772,000. (9/17/07 Tr. at 60 & 61; DTE 84).

A.  Pending And Threatened Litigations

As of the Petition Date, the Debtors knew of three actions pending against either of Santa Fe or Memorial: (a) the Tebow Action; (b) the Ellison Action (defined below); and (c)

the Harris Action (defined below). (B-Exh. 230 at 41-42; Jt. Pre-Tr. Or. at 17).

    1.    <u>Ellison Action</u>

    Prior to the Petition Date, Santa Fe was a defendant in the action captioned *Jackie Eugene Ellison, et al. v. FPC Disposal, Inc., et al.,* Case No. CJ-99-151-01 (the **"Ellison Action"**), in Oklahoma state court. (Jt. Pre-Tr. Or. at 15). Memorial was not a party to the Ellison Action. (9/17/07 Tr. at 141). The Debtors were aware of the Ellison Action since shortly after it was filed in 2001. (Jt. Pre-Tr. Or. at 15). The principal claim of the plaintiffs in the Ellison Action was against FPC Disposal, Inc. for damages caused to land by its improper construction, operation and maintenance of a commercial disposal facility. (D-Exh. 93). Santa Fe's involvement in the lawsuit was as one of many parties who disposed of materials at the facility. (9/17/07 Tr. at 138).

    Prior to the Petition Date, BP Amoco Corporation, a co-defendant of Santa Fe's in the Ellison Action against which Santa Fe asserted a right of indemnity, was defending the Ellison Action on Santa Fe's behalf. (Jt. Pre-Tr. Or. at 15). Santa Fe incurred no material defense costs or expenses in Ellison Action. (9/17/07 Tr. at 139). Soon after the Petition Date, the plaintiffs in the Ellison Action dismissed their claims against Santa Fe. (Jt. Pre-Tr. Or. at 15). The Ellison Action has been settled pursuant to that certain Settlement Agreement and Release, dated February 19, 2007 (the **"Ellison Settlement Agreement"**). (Jt. Pre-Tr. Or. at 15; D-Exh. 85). The settlement was reached without the participation of Debtors (9/17/07 Tr. at 141) who were not required to make any contribution to the settlement.

(9/17/07 Tr. at 141; D-Exh. 85). Santa Fe obtained a release from liability. (9/17/07 Tr. at 141; D-Exh. 85).

2.    Harris Action

Prior to the Petition Date, Memorial was a defendant in a personal injury lawsuit relating to its past ownership of an allegedly contaminated site, located in Alhambra, California, known as Campus 1000 (the **"California Property"**) captioned *Wyomania Harris, et al. v. The Ratkovich Company et al.,* Case No. BC35585, in California state court (the **"Harris Action"**). (Jt. Pre-Tr. Or. at 16). Neither Debtor has hired counsel or incurred material expenses to defend the Harris Action. (Jt. Pre-Tr. Or. at 16).

3.    Other Actions

In the action captioned *Patricia Sinz et al. v. Allied Packing, Inc. et al.,* Alameda County Superior Court, California, Case No. RG 04 139532 (the **"Sinz Action"**), plaintiffs sued a predecessor by merger of Memorial, GlobalSantaFe Corporation and several of its subsidiaries. (Jt. Pre-Tr. Or. at 16). In the action captioned *Rita Troia et al. v. Amchem Products, Inc. et al.,* Alameda County Superior Court, California, Case No. RG 05 194426 (the **"Troia Action"**), plaintiffs sued a predecessor of Memorial, GlobalSantaFe Corporation and several of its subsidiaries as alleged successors-interest to persons allegedly liable to the plaintiffs. (Jt. Pre-Tr. Or. at 16). The plaintiffs in both the Sinz Action and the Troia Action assert claims for personal injuries, strict liability, breach of warranties, negligence, fraud, premises liability and wrongful death arising from alleged exposure to asbestos-containing

27

products. (Jt. Pre-Tr. Or. at 16).  Santa Fe has received a request to provide non-party

discovery from a defendant in an action captioned *Dore Energy Corp. v. Carter-Langham,*

*Inc., et al.,* Docket No. 10-16202, Division B., 38th Judicial District Court, Parish of

Cameron, State of Louisiana (the "**Dore Energy Action**"). (D-Exh. 91; 9/17/07 Tr. at 146).

The Dore Energy Action is in the nature of a so-called oilfield legacy suit, involving different

property than what was at issue in the Tebow Action. (9/17/07 Tr. at 146).  Santa Fe is not

a party to the Dore Energy Action. (D-Exh. 91; 9/17/07 Tr. at 146).

### E.  Claims

All of the Debtors' scheduled claims are for EHI and GSFCSI, and the claims arising

from or related to the Tebow Action, the Ellison Action or the Harris Action. (B-Exh. 127,

Sched. F.; B-Exh. 164, Sched. F.; B-Exh. 167; 9/17/07 Tr. at 148).  In addition, nineteen (19)

proofs of claim have been filed against the Debtors (the "**Filed Claims**").  (Jt. Pre-Tr. Or. at

17).  The Filed Claims consist of the following: (a) six (6) proofs of claim [Claim Nos. 1, 2,

3, 4, 5 & 6] filed on behalf of taxing authorities located within the state of Texas (the "**Tax**

**Claims**") (B-Exh. 208, 209, 210, 211, 212 & 213); (b) three (3) proofs of claim [Claim Nos.

7, 9 & 17] filed by vendors who provided legal and other services to or for the benefit of

Santa Fe in connection with defending the Tebow Action (B-Exh. 214, 216 & 224); (c) two

(2) proofs of claim [Claim Nos. 8 & 16] filed by the plaintiffs in the Troia Action and the

Sinz Action; (d) six (6) proofs of claim [Claim Nos. 10, 11, 12, 13, 14 & 15] filed by GSF

Entities (B-Exh. 217, 218, 219, 220, 221 & 222); and (e) the two (2) proofs of claim [Claim

Nos. 18 & 19] filed by BEPCO (B-Exh. 225 & 226). The Debtors believe that the Tax Claims relate primarily to property of non-debtor affiliates and do not represent obligations of the Debtors. (9/17/07 Tr. at 150, 152).

Claim No. 7 (B-Exh. 214), filed by Michael Pisani & Associates, Inc. against Santa Fe, asserts a claim in the amount of $28,894.46, as an unsecured nonpriority claim for Santa Fe's portion of the cost for professional services performed in May, June and July of 2006 at the request of Santa Fe and certain other defendants in the Tebow Action. (B-Exh. 214; 9/17/07 Tr. at 154).

Claim No. 8 (B-Exh. 215), filed by Rita Troia, et al., against Memorial, asserts a claim in the amount of $5,000,000, as an unsecured nonpriority claim. The documentation attached to Claim No. 8 indicates that the claim arises from the Trioa Action.

Claim No. 9 (B-Exh. 216), filed by Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman LLP against Memorial, asserts a claim in the amount of $28,615.53, as an unsecured nonpriority claim.

Claim No. 10 (B-Exh. 217), filed by GSF Corp. against Memorial, asserts a claim in an unliquidated amount, as a secured claim, at least in part. In the attachment to Claim No. 10, GlobalSantaFe Corporation asserts and reserves rights with respect to, *inter alia,* claims for indemnity and/or contribution arising from claims alleging alter-ego, single-business-enterprise or similar remedies/causes of action in connection with oil and gas or other activities conducted by the Debtors and/or their parents, affiliates or related companies.

Claim No. 11 (B-Exh. 218), filed by GSF Corp. against Santa Fe, asserts a claim in

an unliquidated amount, as a secured claim, at least in part. The attachment to Claim No. 11 contains substantially the same description of the basis for the claim as appears in Claim No. 10.

Claim No. 12 (B-Exh. 219), filed by EHI against Memorial, asserts a claim in the amount of $100,000.00 plus additional unliquidated amounts based on the Demand Note, as a secured claim, at least in part. In the attachment to Claim No. 12, EHI also asserts and reserves right with respect to, *inter alia,* claims for indemnity and/or contribution arising from claims alleging alter-ego, single-business-enterprise or similar remedies/causes of action in connection with oil and gas or other activities conducted by the Debtors and/or their parents, affiliates or related companies.

Claim No. 13 (B-Exh. 220), filed by EHI against Santa Fe, asserts a claim in an unliquidated amount, as a secured claim, at least in part. The attachment to Claim No. 13 contains substantially the same description of the basis for the claim as appears in Claim No. 10.

Claim No. 14 (B-Exh. 221), filed by GSFCSI against Santa Fe, asserts a claim in an unliquidated amount, as a secured claim, at least in part. The attachment to Claim No. 14 contains substantially the same description of the basis for the claim as appears in Claim No. 10.

Claim No. 15 (B-Exh. 222), filed by GSFCSI against Memorial, asserts a claim in the amount of $355,573.80 under the Intercompany Agreement (as defined herein), plus additional unliquidated amounts, as a secured claim, at least in part. In the attachment to

Claim No. 10, GSFCSI also asserts and reserves its rights with respect to, *inter alia,* claims for indemnity and/or contribution arising from claims alleging alter-ego, single-business-enterprise or similar remedies/causes of action in connection with oil and gas or other activities conducted by the Debtors and/or their parents, affiliates or related companies.

Claim No. 16 (B-Exh. 223), filed by Patricia Sinz et al., against Memorial, asserts a claim in the amount of $5,000,000, which is allegedly an unsecured nonpriority claim. The documentation attached to Claim No. 16 indicates that the claim arises from the Sinz Action.

Claim No. 17 (B.-Exh. 224), filed by Noble Energy, Inc., asserts a claim in the amount of $2,653.04, which is allegedly an unsecured nonpriority claim. Claim No. 17 and its attached documentation indicate that the basis for the claim is reimbursement to Noble Energy, Inc., a co-defendant in the Tebow Action, of expert witness fees incurred in defense of the Tebow Action.

No person has filed a proof of claim in either Debtor's bankruptcy case asserting a claim arising out of or related to the Ellison Action (Jt. Pre-Tr. Or. at 15; 9/17/07 Tr. at 139-40), the Harris Action (Jt. Pre-Tr. Or. at 16), or the Dore Action. (B-Exh. 227).

## VII. THE DEBTORS' ASSETS

### A. Liability Insurance Coverage

Insurance coverage exists for the claims asserted in the Tebow Action under a number of the London Market policies. (9/17/07 Tr. at 72; 9/18/07 Tr. at 37, 40-41, 56; B- Exh. 82-96), which name Santa Fe's predecessor-in-interest, Andover Oil Company, as a named insured. (B- Exh. 90 at 19792; 9/18/07 Tr. at 3839).

31

The London Market policies are occurrence policies, meaning that the coverage is effective if the harm begins or occurs within the policy period. (B- Exh. 90 at 18794, 18798, 18985). The "per occurrence" language means that payments for other occurrences would not diminish the fund available for payment of damages arising from the Tebow Property. (9/18/07 Tr. p. 46). Similarly, a payment made by the London Market insurers for damages arising from pollution on the Tebow Property would not reduce the funds available for paying damages arising from other occurrences. (9/18/07 Tr. at 46). The London Market policies explicitly provide coverage for continuous or on-going pollution arising from seepage – the exact kind of pollution alleged to have occurred in the Tebow Action. For example, the 1983-84 policy, Section II, entitled "Cost of Control, Clean-Up, Removal of Debris, etc.," contains the following description of the pollution coverage provided:

1. <u>INTERESTS COVERED</u>:

(a) To indemnify or pay on behalf of the Assured any sum or sums which the Assured may be obligated to pay or agrees to pay (whether by contract, agreement or otherwise) or incurs as costs and/or expenses on account of:

(v) Cleaning-up and/or Containing and/or Removing and/or neutralizing seeping, polluting or contaminating substances, emanating from the operations of the Assured . . . .

(b) This insurance also to indemnify or pay on behalf of the Assured any sum or sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law for:

32

> Personal injury and/or loss of, damage to or loss of use of property and/or any other damages against the Assured, caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination.

(B-Exh. 90 at 18597-18958). Under Section II of the 1983-1984 Policy, there appears to be at least $20 million in primary coverage for each covered occurrence. (B- Exh. 90 at 18962; 9/18/07 Tr. at 41, 42).

Under Section III, the London Market policies promise to pay

> all sums which the Assured shall be obligated to pay or incurs as costs and/or expenses, by reason of Liability imposed on the Assured by Law or assumed by the Assured under contract or agreement, on account of . . . injury to or destruction of property (including loss of use and any other consequential losses resulting therefrom) . . . in connection with the land . . . operations of the Assured.

(B- Exh. 90 at 18979). Also under Section III, there is $95 million in excess coverage for each covered occurrence. If there is no coverage under Section II, the "excess coverage" drops down to a $100,000 deductible. (B- Exh. 90 at 18984-18985; 9/18/07 Tr. at 45).

There is no evidence of any payments made under the London Market policies for claims made by the Tebow Plaintiffs. Thus, the full amount of coverage is still available to pay BEPCO's claims. (9/18/07 Tr. at 43).

The London Market policies require that Santa Fe inform the London Market insurers about any claims. The General Conditions of the Policies provide that claims made by Santa Fe "shall not be prejudiced by any unintentional and/or inadvertent: (a) error or omission and/or (b) incorrect description and/or (c) failure to report as required and/or error in the

name or title of the Assured." (B- Exh. 90 at 18798, 18801-18802). The London Market Policies agree that in the event of bankruptcy of any Assured, the "underwriters shall not be relieved thereby of the payment of any claims recoverable hereunder because of such bankruptcy or insolvency." (B- Exh. 90 at 18799).

Santa Fe also has insurance policies, which cover the asbestos claims against the Santa Fe-Pomeroy subsidiary. (9/17/07 Tr. at 73).

Santa Fe admits that the policies that offer potential coverage for the asbestos claims of Sinz and Troia are different from the policies that offer coverage for the Tebow claims. (9/17/07 Tr. at 199-200).

1.    The Insurance Review Project

Prior to the filing of the Bankruptcy Cases, Debtors did not have the financial ability to conduct a detailed insurance archeology review for their potential insurance policies and coverage. (9/18/07 Tr. at 96). GSFCSI in conjunction with Mr. Faure's duties for the Debtors, and under his management and direction, took on the task of reviewing the substantial insurance information in archive relating to the Santa Fe legacy companies (the "Insurance Review Project"). In October 2006, GSFCSI hired Ken Smith as an assistant risk manager on a permanent basis, and a paralegal, Chandra Polk, on a temporary basis, in connection with the Insurance Review Project. (9/17/07 Tr. at 66, 67 & 68). The Insurance Review Project began in October 2006 and was completed in May 2007. (9/17/07 Tr. at 68; 9/18 Tr. at 57). Of the over 250 boxes identified as potentially containing insurance policies and related information, consisting of thousands of pages of material, 50

boxes were pulled for review at a time.  Ms. Polk reviewed and inventoried the boxes with the assistance of Mr. Faure and Mr. Smith.  Mr. Faure worked with Ms. Polk and Mr. Smith on a daily basis in connection with the Insurance Review Project.  (9/17/07 Tr. at 67, 83 & 84).

The Insurance Review Project was undertaken for the benefit of the entire GlobalSantaFe corporate family as the boxes reviewed related to the Santa Fe legacy companies' insurance program.  The overall goal of the Insurance Review Project was to compile a database of policies that could be reviewed as claims came up against any Santa Fe entity, whether it be the Debtors or others. (9/17/07 Tr. at 67, 68, 69, & 86).

D-Exh. 74, which was prepared under Mr. Faure's direction and supervision, summarizes the insurance review as it relates to the Debtors and identifies approximately 600 insurance policies potentially relating to claims against the Debtors and other information relating to such policies.  (9/17/07 Tr. at 69 & 70; D-Exh. 74).

Once the insurance policies were inventoried, notices were sent out as required with respect to the Sinz, Troia and Tebow claims.  The notification process is ongoing. (Stipulated Fact 82; 9/18/07 Tr. at 90).

The underlying information included on D-Exh. 74 was produced to BEPCO in late February or early March of 2007.  Debtors continued their review of the information included on D-Exh. 74 after it was produced to BEPCO to continue building the database.  (9/17 Tr. at 71 & 72).  Debtors through GSFCSI continue to investigate additional potential insurance coverage.  (9/18/07 Tr. at 90 & 91).

35

Another option available to Debtors, assuming such could be funded, is retention of an outside consultant to search for additional Andover (predecessor to Santa Fe) insurance. Debtors have identified consultants and have received quotes for basic searches in the $50,000 range and higher depending on work to be done. The cost of an outside consultant to review the 250 boxes involved in the Insurance Review Project would have been from $300,000 to $400,000, which influenced Debtors to undertake such review on an in-house basis through GSFCSI. (9/17/07 Tr. at 85).

Based on the results of the Insurance Review Project, Memorial asserts rights as an insured under insurance policies for some or all of the periods of asbestos exposure alleged in the Troia and Sinz Actions; and based on the allegations against Santa Fe or its predecessors made in the Tebow Action, Santa Fe asserts insurance coverage under various insurance policies issued by various insurance companies for Tebow related claims. (Stipulated Facts 80-81).

2.    The London Market Policies

Several insurance policies issued by the London Market were identified as Trial exhibits. The same form of insurance policy exemplified by B-Exh. 90 was used for a number of years by the London Market and similar coverage would appear to be provided thereunder (the "**London Market Policies**"). The London Market Policies from the early 1980s through 1990 are similar with the language carrying over in many respects from year to year. (9/18/07 Tr. at 40, 41, 55 & 56; B-Exh. 82-96).

36

Santa Fe did not produce the London Market Policies in the Tebow Action because it was not aware of them prior to commencement of the Bankruptcy Cases and discovered them in connection with the Insurance Review Project. (9/18/07 Tr. at 57; 58 & 59). By its terms the London Market Policies appear to cover claims for (i) "cleaning up and/or containing and/or removing and/or neutralizing seeping, alluding or contaminating substances emanating from the operations of the Assured," and (ii) for "personal injury and/or loss or damage to or loss of use of property and/or any other damages against the assured caused by or alleged to have been caused directly or indirectly by seepage, pollution or contamination," which allegations were made in the Tebow Action. (9/18/07 Tr. at 39 & 40).

In the May/June of 2007 time frame, just after the Insurance Review Project, Santa Fe concluded that the London Market Policies may provide coverage. Debtors believe that Santa Fe and Andover each would be covered insureds under the London Market Policies. (9/18/07 Tr. at 38, 39 & 58; B-Exh. 82-96). Debtors' understanding is that AON is the successor broker with respect to the London Market Policies. (9/17/07 Tr. at 81; 9/18/07 Tr. at 46 & 47).

Under the London Market Policies the insured is obligated to notify the broker. Once AON has been put on notice, it is required to give notice to the London Market insurers. The London Market insurers respond through AON. AON can also assist with respect to obtaining coverage for claims from the London Market insurers. BEPCO does not have the obligation of notice under the policies. (9/17/07 Tr. at 87; 9/18/07 Tr. at 89 & 90).

37

Debtors asked AON to put the London Market insurers on notice of the Tebow claims. Debtors believe such notice was proper under the London Market Policies. Debtors have not received a response from AON regarding the identity of the London Market insurers; and have not heard from AON with respect to the position of the London Market insurers on coverage in connection with Tebow related claims since May 30, 2007. (9/17/07 Tr. at 81; 9/18/07 Tr. at 48, 49, 54 & 55).

Through counsel, Santa Fe has followed up with AON. AON's response was that it is having a hard time finding records and is very busy but that it is being diligent about the matter. (9/18/07 Tr. at 55). It is not surprising that communications with AON regarding the London Market Policies has been slow; the policies are old, long tail claims are involved, there are many underwriters that have to be contacted, it is a very busy time in the energy insurance business due to claims arising from hurricanes Rita and Katrina, and AON is the largest energy insurance broker. (9/17/07 Tr. at 87 & 88).

The insured under the London Market Policies owes a duty of cooperation with the insurers. The Plan also provides for cooperation by the GlobalSantaFe Entities in pursuing insurance claims, including the duty of cooperation that the Debtors have under the insurance policies. (9/18/07 Tr. at 91; B-Exh. 160D). As a result of the post-bankruptcy communications between Debtors and insurers some insurers have agreed to provide a defense for Tebow claims under a reservation of rights. (9/17/07 Tr. at 74). Although certain insurers have indicated that they would pay defense costs relating to Tebow claims, Debtors are still waiting on insurers' responses as to whether they will come forward to defend Debtors in connection with claims

38

filed by BEPCO in the Bankruptcy Cases. (Stipulated Fact 83; 9/18 Tr. at 95 & 96).

3.    Summary re Insurance

Notwithstanding all that has been accomplished through the Insurance Review Project and the communications between Debtors and insurers (or brokers) as of the trial, substantial issues remain for resolution in connection with Debtors' insurance coverage, which could be adversely affected by allowing BEPCO to pursue insurance directly, including:

(a)    Coverage for claims asserted against Debtors are issues still to be discussed and determined. (9/17/07 Tr. at 74).

(b)    Retroactive premiums, involving the right of insurers to charge the insured an additional premium based on losses paid under a policy, have not been calculated and Debtors believe there may be exposure for retroactive premiums. (9/18/07 Tr. at 92; B-Exh. 90).

(c)    Debtors do not have a full and complete understanding of what the deductibles and/or aggregate losses are, which amounts would depend on many factors. (9/18/07 Tr. at 92 & 93; B-Exh. 90).

(d)    Debtors do not have a full and complete understanding of how the accounting procedures and provisions applicable to the calculation of, and how, profit commissions would be calculated under this policy, but it would depend on losses paid and the premiums paid, information for which Debtors must rely on the brokers and insurers. The estate has invested a substantial amount of time and effort in determining these amounts. (9/18/07 Tr. at 93 & 94; B-Exh. 90).

39

(e)    Debtors do not have a full and complete understanding of the aggregate limits of underlying policies, as to date Debtors' effort has been focused on finding coverage rather than deductions and exclusions and defenses for the insurers. (9/18/07 Tr. at 94 & 95; B-Exh. 90).

(f)    Debtors potentially have duties of cooperation under insurance policies to assist the insurer on its defense of a case wherever it is filed which would use up further of the Debtors' resources. (9/17/07 Tr. at 78).

B. <u>Other Assets</u>

Neither Debtor owns or holds any interest in real property. (Jt. Pre-Tr. Or. at 17).  As of the Petition Date, Memorial held approximately $100,000 cash. (B-Exh. 131 at 1; 9/17/07 Tr. at 168).  The cash consisted entirely of funds advanced to Memorial on or about August 10, 2006, pursuant to the Demand Note. (Jt. Pre-Tr. Or. at 17).  The funds were advanced to Memorial in anticipation of its bankruptcy filing. (Jt. Pre-Tr. Or. at 17).  Santa Fe had no cash. (B-Exh. 164).

As of the Petition Date, the Debtors' other assets were limited and in the nature of certain choses in action. For instance, Santa Fe claimed a right to a small settlement payment from a class action lawsuit against Conoco (the **"Class Action Settlement Claim"**). (9/17/07 Tr. at 62).  The funds from the Class Action Settlement Claim, $60,000 (9/17/07 Tr. at 174), do not appear actually to have been received or accounted for by the Debtors.

Santa Fe also was entitled to recover a small amount of escheated funds held by the State of Texas (the **"Escheated Funds Claim"**). (9/17/07 Tr. at 62).  According to Mr. Faure,

the Escheated Funds Claim has been fully monetized and yielded a recovery of approximately $21,000. (9/17/07 Tr. at 175).

Memorial listed on Schedule B of its Schedules of Assets and Liabilities (B-Exh. 131 at 4) an intercompany claim against an affiliate in the amount of $5,722, which Mr. Faure has testified is an intercompany receivable for a tax refund related to its former facility located in Alhambra, California (the "**Intercompany Tax Refund Claim**"). (9/17/07 Tr. at 64, 176).

Santa Fe and Memorial each also have scheduled (B-Exh. 132 at 4; B-Exh. 168 at 4) claims for indemnity and contribution against certain co-defendants in the Tebow Action and the Ellison Action (the "**Litigation Indemnity Rights**"). The value of those claims is at most to reduce the extent of the Debtors' exposure were someone else to be successful in recovering on a claim against the Debtors within scope of the matters for which the Debtors are entitled to indemnity and/or contribution. (9/17/07 Tr. at 177-78). The Litigation Indemnity Rights related to the Ellison Action are of no apparent further value to the Debtors because the Ellison Action has been settled and the Debtors have been released from liability by the plaintiffs in that litigation. (9/17/07 Tr. at 141).

Additionally, in his testimony at trial, Mr. identified a potential source of recovery under a pooling order from the State of Oklahoma (the "**Potential Pooling Order Claim**"). (9/17/07 Tr. at 63). According to Mr. Faure's testimony, the Potential Pooling Order Claim relates to an interest that Santa Fe might have had in one of the tracts at issue. (9/17/07 Tr. at 63). Mr. Faure conceded, however, that there remained questions about whether the rights

41

giving rise to the Potential Pooling Order Claim had been sold or assigned by Santa Fe. (9/17/07 Tr. at 63). Nor was he willing or able to suggest a dollar value to what the Potential Pooling Order Claim might be worth to Santa Fe. (9/17/07 Tr. at 63).

On its original Schedule B (B-Exh. 164 at 4), Santa Fe listed a "[c]ontingent, unliquidated and presumed disputed claim against [Memorial] for value of assets distributed to it upon Debtor's liquidation" (the "**Inter-Debtor Liquidation Claim**"). However, on its amended Schedule B (B-Exh. 168), Santa Fe omitted the Inter-Debtor Liquidation Claim. Notwithstanding that action, Mr. Faure now appears to take the position that the Inter-Debtor Liquidation Claim has a value of approximately $500,000. (9/17/07 Tr. at 58, 62).

Debtors also assert that all claims that BEPCO seeks to assert against the GSF Entities arising out of or related to the Tebow Action on the basis of alter ego, veil piercing or single business enterprise or similar theories (collectively, the "**Alter Ego Claims**") are property of their estates under section 541(a) of the Bankruptcy Code. (Jt. Pre-Tr. Or. at 3). The Debtors have not scheduled the Alter Ego Claims (B-Exh. 127, 131, 164 & 168), and Mr. Faure has testified that they do not exist. (9/17/07 Tr. at 127; 9/18/07 Tr. at 86).

After Santa Fe's dissolution first the Ellison Action, and then the Tebow Action, arose, neither of which were anticipated at the time of Santa Fe's dissolution, representing potential liabilities of both Santa Fe and Memorial. (10/19/06 Tr. at 38 & 39). Debtors commenced the Bankruptcy Cases in part to deal with the technical glitch in Santa Fe's dissolution that was discovered when Debtors looked at whether Santa Fe could assert the Dissolution Defense in the Ellison and Tebow Actions. Because Debtors could not uncover

evidence that publication notice of Santa Fe's dissolution had been effected upon dissolution in December 2000, Debtors concluded that both Santa Fe and Memorial remained open to possible limited liability under the Wyoming dissolution statute. (9/17/07 Tr. at 49 & 50).

Debtors' understanding was that under the Wyoming dissolution statute there is a single limit of liability for shareholders that had received assets upon dissolution and not a liability to each claimant asserting a claim within the two year notice period. Thus, Memorial, as Santa Fe's sole shareholder, might have liability for the assets it received upon dissolution but not in excess of that one amount. Debtors were concerned that pending litigation and investigatory matters and possible future legacy claims might mean multiple attacks on this single fund. (10/19/06 Tr. at 48; 9/17/07 Tr. at 51; 9/18/07 Tr. at 73).

Santa Fe's dissolution appeared to be incomplete due to the notice problem, Debtors therefore examined Memorial's potential liability under the Wyoming dissolution statute. (9/17/07 Tr. at 51). As of the commencement of the Bankruptcy Cases, Debtors' best estimate of the amount distributed by Santa Fe to Memorial upon Santa Fe's dissolution was $500,000 based upon work done by Ernst & Young. (9/17/07 Tr. at 58 & 59; DTE 83).

Among the claims and other issues that Debtors considered in deciding whether to commence the Bankruptcy Cases were those related to the Ellison Action, the Tebow Action, the Harris Action and the EPA and California Water Board investigations of Memorial. Debtors also considered the wearing effect of piecemeal litigation involving one case after another over a possible finite pot of money; the ability to obtain jurisdiction over a geographically disparate group of claimants (located in Texas, Oklahoma, Louisiana and

43

California, among other states); and possible multiple claims on the same insurance policies and the problem of dividing up the proceeds of such policies among multiple claimants. (10/19/06 Tr. at 49 & 50).

The Tebow Action was the principal factor in Debtors' commencing the Bankruptcy Cases. Debtors were also concerned about the Ellison Action, the Harris Action, the EPA and California Water Board investigations, and the probability that Debtors would be named in future oilfield legacy suits. (9/17/07 Tr. at 55 & 56).

Debtors were afraid they would be exposed to numerous attacks on the limited distribution on dissolution liability under the Wyoming dissolution statute. In addition, any other assets to which Debtors may have had rights, such as the escheat funds, would be the subject of multiple and serial attacks and recovery and possible inconsistent decisions. Debtors commenced the Bankruptcy Cases in an effort to obtain the certainty and efficiency of a single ruling on the Dissolution Defense in one jurisdiction which would have jurisdiction over all interested parties. (9/17/07 Tr. at 52; 9/18/07 Tr. at 73).

F.  The Plan

On August 28, 2007, Debtors filed *Debtors' Joint Plan of Liquidation* (D.I. 222) (the "Plan") without an accompanying disclosure statement pursuant to the *Stipulation And Agreement Providing For Continuance Of Pending Litigation And Addressing Related Matters* (Adv. D.I. 110) (the "**Litigation Continuance Stipulation**") and the with Court's approval. (Stipulated Facts 29 and 30; B-Exh. 160D).

44

The Plan provides, *inter alia*, for payment in full of administrative, priority and secured claims, convenience and general unsecured claims from Debtors' existing assets and from a portion of the funding to be provided by the GlobalSantaFe Entities pursuant to the settlement described in Section 4.1 of the Plan. The Plan further provides for the creation of a trust to resolve Class 5 (the *Sinz* and *Troia*) Claims and Class 6 Claims (including all other litigation claims including the claims asserted by BEPCO and other oilfield legacy type claims); for the trust to be funded with a portion of the funding to be provided by the GlobalSantaFe Entities; and for the trust to pursue, with the cooperation and assistance of the Debtors and the GlobalSantaFe Entities, insurance coverage for Class 5 and 6 Claims. *(See generally*, Articles 3 and 4 of B-Exh. 160D).

The Plan also includes a settlement of issues between Debtors and the GlobalSantaFe Entities (the "Settlement"), subject to the Court's approval. The Settlement includes a cash payment (in excess of the amount of the distribution upon dissolution suggested by Memorial's 2000 tax return), the release of all claims asserted by the GlobalSantaFe Entities against the estates, including administrative claims, and any claims under the DIP Financing, the GlobalSantaFe Entities' commitment in connection with the pursuit of insurance rights, and enables the Trust (as contemplated under the Plan) to utilize the insurance archeology review. (9/17/07 Tr. at 20 & 204; 9/18/07 Tr. at 80 & 82). *See* Section 4.1 of the Plan (B-Exh.160D). The Settlement will not proceed if the Bankruptcy Cases are dismissed or if relief from stay is granted to allow BEPCO to pursue claims against the GlobalSantaFe Entities or directly against Debtors' insurance. (9/18/07 Tr. at 82 & 83).

45

Pro-rata language is included in Section 3.3.7 of the Plan in the event there are competing claims for insurance. Santa Fe is unaware of creditors in Class 6 other than BEPCO. (9/18/07 Tr. at 78 & 80; B-Exh. 160D).

The Plan separately classifies the Sinz and Troia claims from the BEPCO and Oilfield Legacy Claims because there are different groups of policies implicated by the claims and they will look to a completely separate and distinct pool of insurance proceeds for payment. The insurance identified so far for Class 5 *Sinz* and *Troia* claims are policies issued to Pomeroy, the predecessor by merger to Memorial. (9/17/07 Tr. at 196, 198 & 201; B-Exh. 160D).

Debtors could not pursue a plan of reorganization on a faster basis than they did because the Court's March 26, 2007 Order. (9/18/07 Tr. at 91).

G. <u>The Debtors' Estates Are Administratively Insolvent</u>

As of the Petition Date, the total cash held by the Debtors was just $100,000 (B-Exh. 131 at 1). By motion, dated October 3, 2006 (B-Exh. 129), the Debtors sought approval of the Master Intercompany Labor and Services Agreement (as amended, the "**Intercompany Agreement**") and authority to incur intercompany indebtedness to GSFCSI under the Intercompany Agreement up to $200,000. Mr. Faure testified at the October 19, 2006 hearing that if the Debtors incurred the full amount of intercompany indebtedness under the Intercompany Agreement they did not have the present ability to repay it and would not have the ability to repay it for at least several months. (B-Exh. 230 at 83).

46

Since the Petition Date, Memorial has made disbursements of cash in the aggregate amount not less than $84,132.83, including the following: (a) payment of $75,777.40 to its bankruptcy counsel Stevens & Lee, P.C., in partial satisfaction of fees and expenses allowed on an interim basis for the period from the Petition Date through October 31, 2006 (the **"S&L First Interim Application"**); and (b) payment to Miller Advertising Agency, Inc. in the amount of $8,291.43 for publication of a legal notice in the Wall Street Journal National Edition. (B-Exh. 141; Jt. Pre-Tr. Or. at 17).

As of August 31, 2007 (the most recent period for which either Debtor has filed a Monthly Operating Report), Memorial had cash of just $80,379 (Case No. 06-10859, Bankr. D.I. 252) and Santa Fe continued to have no cash (Case No. 06-10860, D.I. 39). Furthermore, Mr. Faure has testified that Debtors do not expect to receive additional cash unless a distribution is received under the Potential Pooling Order Claim. (9/17/07 Tr. at 173). Accordingly, without accounting for accrued but unpaid postpetition liabilities, as of August 31, 2007, the Debtors' net cash position had eroded by nearly twenty percent (20%) since the Petition Date.

Furthermore, the Debtors' own Cash Flow Projections for the 12-Month Period: January 1, 2007 through December 31, 2007 (the **"Cash Flow Projections"**), reflects that the Debtors' cash would be entirely consumed by November 2007, leaving a negative balance of $17,143 by month's end. (B-Exh. 155; 9/17/07 Tr. at 170). The Cash Flow Projections indicate further that this negative balance will increase by December 31, 2007 to a cash deficit of $37,143. (B-Exh. 155; 9/17/07 Tr. at 170). The Debtors have no reliable

47

source of income, and therefore the only likely outcome is that the cash shortfall will continue to increase.

The Debtors' financial condition when viewed on a cash basis is poor. Their situation when accrued, but unpaid postpetition obligations are considered is worse. Substantial administrative expenses are accruing in these cases, consisting largely of (a) fees and expenses for the two law firms representing the Debtors' estates and (b) intercompany liabilities accruing to GSFCSI for its provision of support services.

Except for the S&L First Interim Application covering the period from the Petition Date through October 31, 2006, neither Stevens & Lee, P.C. ("**Stevens & Lee**") nor Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P. ("**Kean Miller**"), the Debtors' two law firms retained in these Bankruptcy Cases, have filed fee applications. (B-Exh. 141; Jt. Pre-Tr. Or. at 17). Accordingly, as chapter 11 cases go, this one is extremely unusual in that the Debtors' professionals have foregone payment of their fees and expenses for nearly a year now (and fourteen months in the case of Kean Miller) without any promise or commitment of payment. (9/17/07 Tr. at 189).

Mr. Faure, however, testified under cross-examination at trial that Stevens & Lee has estimated its unpaid fees and expenses for its postpetition work in the chapter 11 cases at between $200,000 and $250,000. (9/17/07 Tr. at 187 & 189). Additionally, he testified that he had received "informational invoices" from Kean Miller that he recalled as seeking payment of between $150,000 and $170,000 for the firm's postpetition services. (9/17/07 Tr. at 188). Thus, in order to satisfy the anticipated claims of the Debtors' professionals alone,

the Debtors will need at least $350,0000. That is money the Debtors do not currently have and have no realistic prospect of obtaining from any source other than the GSF Entities.

The Debtors have been inconsistent in their position on their liability to GSFCSI for the value of support services provided to the Debtors since the Petition Date.[6] Their current position seems to be that GSFCSI does have valid administrative expense claims against Memorial for such postpetition services, but that such claims will be forgiven pursuant to the purported settlement with the GSF Entities contained in the Plan if it is confirmed. (9/18/07 Tr. at 113).

Mr. Faure did not testify to the value of such claims, indicating instead that Memorial's liability should be determined from the Intercompany Agreement. (9/17/07 Tr. at 117-18). That position, however, leads to a circular result as the Intercompany Agreement states that Memorial's obligation under the Intercompany Agreement is "to pay [GSFCSI] for furnishing such services at cost plus a five percent (5%) mark-up." (B-Exh. 235 at ¶ 2; B-Exh. 236)

The only other evidence in the record concerning the value of the intercompany charges under the Intercompany Agreement derives from what Memorial has reported under the line item "Amounts due to insiders" on its Balance Sheet filed in connection with its

---

[6]    Mr. Faure testified inconsistently at Trial about whether GSFCSI was seeking recovery for the value of support services provided to the Debtors. Initially, he testified on cross-examination that GSFCSI had waived all such charges because the Debtors were in bankruptcy. (9/17/07 Tr. at 116-18). The second day of Trial, he testified on re-direct examination that the charges were valid obligations against Memorial, but would be waived under the settlement in the Plan. (9/18/07 Tr. at 81).

Monthly Operating Reports. That number, while small in absolute terms, has progressively increased over the course of the case, totaling $13,260 as of August 31, 2006 (Bankr. D.I. 252).

The administrative expense claim that GSFCSI would seek to recover from the Debtors' estates were there any reasonable prospect of payment might be much greater than what has been disclosed on the Debtors' financial reporting to this Court. It is undisputed that Memorial is dependent upon GSFCSI to provide all legal, tax, bookkeeping and other support services. (Jt. Pre-Tr. Or. at 7; 9/17/07 Tr. at 111). Such services include Mr. Faure's services as Memorial's estate representative in connection with these proceedings (9/17/07 Tr. at 117) and would presumably also include the services of the personnel utilized in the Insurance Review Project undertaken by the GSF Entities.

## VII.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has subject matter jurisdiction over the Pending Motions pursuant to 28 U.S.C. § 1334(b) as they arise in cases under Title 11 of the Bankruptcy Code. Venue is proper in this district under 28 U.S.C. § 1409(a). The Pending Motions involves matters that are core proceedings under 28 U.S.C. § 157 (b).

### B.  Santa Fe Is An Eligible Debtor Under Section 109 Of The Bankruptcy Code

A dissolved corporation's eligibility to be a debtor under Chapter 11 is determined under state law. *In re State Park Building Group, Ltd.*, 316 B.R. 466, 472 (Bankr. N.D. Tex. 2004); *In re Ethanol Pacific, Inc.*, 166 B.R. 928, 930 (Bankr. D. Idaho 1994). The

50

determination rests on the existence of the corporation after dissolution. *Ethanol*, 166 B.R. at

930. The Wyoming dissolution statute provides, in relevant part:

> § 17-16-1405(a) Effect of dissolution
>
> (a) A dissolved corporation continues its corporate existence
> but may not carry on a business except that is appropriate to
> wind up and liquidate its business and affairs, including:
>
>> (i) collecting its assets...;
>>
>> (iii) discharging or making provision for
>> discharging its liabilities...;
>>
>> (v) doing every other act necessary to wind up
>> and liquidate its business and affairs.

Thus, under Wyoming law, a dissolved Wyoming corporation continues its corporate

existence to liquidate its assets and wind up its business affairs.

Bankruptcy courts have consistently held that where state law authorizes a dissolved

corporation to remain in existence after dissolution to wind up its affairs, the dissolved

corporation is eligible to file for bankruptcy protection under Section 109 of the Bankruptcy

Code. *See In re State Park Building Group, Ltd.*, 316 B.R. 466, 472 (Bankr. N.D. Tex. 2004)

(dissolved Texas corporation determined to be eligible debtor); *In re White Farms, Inc.*,

94 B.R. 410, 12-13 (Bankr. W.D. Va. 1998) (court held that because Virginia statute

authorized a dissolved corporation to pursue claims, corporation was authorized to file

Chapter 11 petition).

The Wyoming dissolution statute is analogous to the dissolution statutes that were

addressed in *State Park* and *White Farms*. The statutes in those decisions, like the Wyoming

51

statute, authorize a dissolved corporation to maintain its corporate existence to wind up its affairs.

As of the Petition Date, Santa Fe was still in existence as a Wyoming corporation under Wyoming state law. Testimony from Mr. Faure demonstrates that after the December, 2000 dissolution, Santa Fe had been sued and was defending the *Ellison* and *Tebow* Actions and further was confronted with the potential for substantial future oilfield legacy lawsuits in Louisiana and elsewhere. Because Wyoming law provides for Santa Fe to maintain its corporate existence to wind up its affairs, Santa Fe's existence as of the Petition Date was sufficient for it to be an eligible debtor, and to file its Chapter 11 petition, under Section 109 of the Bankruptcy Code. Accordingly, BEPCO's Motion to Dismiss the Santa Fe case on the ground of Santa Fe's alleged ineligibility to be a debtor is DENIED.

C.  The Bankruptcy Petitions Were Not Filed In Bad Faith

BEPCO seeks dismissal pursuant to Section 1112(b) of the Bankruptcy Code on the grounds that (i) the Bankruptcy Cases were filed in bad faith, or lacking good faith, because Debtors allegedly do not have operating businesses, employees or substantial assets and therefore cannot reorganize as going concerns, (ii) there has been and/or will be continuing loss or diminution of the Debtors' estates, and (iii) the Bankruptcy Cases were merely a litigation tactic to gain an advantage in a two-party dispute between Debtors and BEPCO. The Court rejects each of these arguments for the reasons stated below and will deny the

Motion to Dismiss on bad faith grounds.[7]

Section 1112(b) authorizes the Court to dismiss or convert a case, whichever is in the best interest of the creditors, for "cause." A non-exclusive list of examples that constitute "cause" is set forth in Section 1112(b)(4). Bankruptcy courts are instructed to proceed in a deliberate manner when confronted with a motion to dismiss under Section 1112(b) and should not "precipitously sound the death knell for a Chapter 11 debtor by prematurely converting or dismissing the case." *In re Tracey Service Company, Inc.*, 17 B.R. 405, 409 (Bankr. E.D. Pa. 1982).

Section 1112(b) imposes a good faith requirement in respect of Chapter 11 petitions. *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 2001). In making the determination

---

[7]    During Trial the Court asked what point in time (*i.e.* as of the Petition Date, or as of the Trial) was relevant in determining whether the Bankruptcy Cases were filed in good faith, i.e., could the Court consider post-petition developments. If there was good faith as of the Petition Date, the inquiry is complete. If there is a question about good faith as of the Petition Date, post-petition events can and should be considered. *In re Alton Tel. Printing Co.*, 14 B.R. 238, 241 (Bankr. S.D. Ill. 1981) (In concluding that the petition was not in bad faith, and denying a creditor's motion to dismiss, the bankruptcy court expressly considered that: (1) debtor had filed a plan of reorganization; (2) the case was progressing in an orderly and expeditious manner; and (3) debtor had cooperated with the court in proceeding toward an orderly and equitable distribution of its assets). *Cf. In re Victory Constr. Co.*, 37 B.R. 222, 228 (B.A.P. 9th Cir. 1984) (reversing an order which had denied a motion to dismiss based on alleged "bad faith" but which had lifted the stay for "cause" on essentially the same ground, because after appeal debtor fully complied with the conditions of the stay order pending appeal – in effect, adequate protection granted to the appellee - and continued to negotiate a plan of reorganization and a hearing on confirmation ultimately took place, and reasoning that the subsequent events had "purged" any bad faith and that "there [was] little question but that events subsequent to appeal h[ad] outrun the original issue, thereby rendering them moot."). Further, courts in Chapter 7 and 13 cases have considered post-petition conduct in determining whether dismissal is appropriate. *See In re Cortez*, 457 F.3d 448 (5th Cir. 2006) (courts must examine post-petition events in deciding motion to dismiss); *In re Pearson*, 354 B.R. 558 (Bankr. D. Mass. 2006) (in examining debtor's good faith a court must examine the "totality of the circumstances," which includes "an examination of a debtor's pre- and post-petition conduct.").

whether the commencement of a bankruptcy case is imbued with "good faith," the Court must engage in a "fact intensive inquiry" and examine the "totality of facts and circumstances" that gave rise to the filing of the petition. *Id.* at 165.

The Third Circuit has established two essential principles that should be utilized when determining good faith: (i) whether the petition serves a valid bankruptcy purpose; and (ii) whether the petition was filed merely to obtain a tactical litigation advantage. *Id.* at 165.

In its Motion to Dismiss, BEPCO suggests that the petitions were filed in bad faith because it is not possible for the Debtors to reorganize under Chapter 11 as operating entities. In support of this argument, BEPCO highlighted certain facts, which Debtors do not dispute, that indicate that the Debtors will not emerge from bankruptcy with an operating business enterprise. That Debtors have filed a liquidating Plan confirms this contention. From this BEPCO argues that bad faith exists. However, this inference, which serves as the primary basis of the Motion to Dismiss, fails to account for an alternative, and equally valuable, purpose of a Chapter 11 proceeding: to facilitate an orderly liquidation of claims and assets of an estate in a central forum. *See In re Chameleon Systems, Inc.*, 306 B.R. 666 (Bankr. M.D. Cal. 2004)(noting that liquidation is a valid purpose under Chapter 11); *In re Deer Park, Inc.*, 136 B.R. 815, 818 (BAP 9th Cir. 1992)(a debtor's continuing participation in a planned orderly liquidation may in fact be necessary to bring about the maximum recovery of creditors); *Locks v. U.S. Trustee*, 157 B.R. 89, 96 (W.D. Pa. 1993)("liquidation may be contemplated in a valid Chapter 11 reorganization.")

For purposes of Section 1112, "rehabilitation" does not mean the same thing as "reorganization" because the latter may contemplate a complete liquidation. *See generally, In re Northeast Family Eyecare, P.C.*, 2002 W.L. 1836307 (Bankr. E.D. Pa. 2002); *Accord In re GPA Technical Consultants, Inc.*, 106 B.R. 139, 142 (Bankr. S.D. Ohio 1989) (the probability that a liquidating plan may be filed is not grounds for dismissal because the submission of such a plan is proper under Chapter 11).

Where a debtor seeks to liquidate or to continue its liquidation effort in an orderly fashion under Chapter 11, the relevant inquiry for purposes of good faith analysis focuses on whether the petition might reasonably have the effect of "maximize[ing] the value of the bankruptcy estate." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004) *quoting Toibb v. Radloff*, 501 U.S. 157, 163, 111 S. Ct. 2197, 115 L. Ed. 2d, 145 (1991). Liquidation under Chapter 11 maximizes the value of an entity where there is some value that otherwise would be lost outside of bankruptcy. *Integrated*, 384 F.3d at 120.

Courts have routinely rejected motions to dismiss under Section 1112 where, as here, the purpose of the bankruptcy is to conduct an orderly liquidation of the debtor's assets for the benefit of all creditors. *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531 (Bankr. W.D. Tenn. 1986) (holding that a bankruptcy petition should not be dismissed where a liquidating plan would benefit all creditors and the bankruptcy served the purpose of allowing the debtor to wind up its affairs and confirm a liquidating plan that would benefit all creditors). *In re Chameleon Systems, Inc.*, 306 B.R. 666 (Bankr. N.D. Cal. 2004) (court held that debtor with no income, operation or employees and unsecured debt of less than

$10,000 could seek relief under Chapter 11); *In re Western Pacific Airlines, Inc.*, 218 B.R. 590 (Bankr. D.Colo. 1998) (court denied motion to dismiss a liquidating Chapter 11 case because liquidation will proceed more expeditiously and less expensively under the control of the debtor); *In re GPA Technical Consultants, Inc.*, 106 B.R. 139 (Bankr. S.D. Oh. 1989) (motion to dismiss denied where Chapter 11 debtor had ceased all business operations and proposed a liquidating plan).

Mr. Faure testified that the Debtors filed for bankruptcy protection because of the pending and potential future claims against Santa Fe and Memorial and the need to resolve such claims and allow such claimants to obtain the benefit of Debtors' assets, including the distribution upon dissolution amount, insurance and others on a fair and equitable basis and not allow certain creditors to realize the benefits of such assets to the exclusion and detriment of others. In addition, Mr. Faure testified that rather than attempting to resolve the pending and future claims in various jurisdictions throughout the United States, Debtors filed the Bankruptcy Cases to resolve all claims in a centralized forum and to distribute assets to legitimate creditors in an equitable manner. Moreover, the centralized bankruptcy forum would make resolution of the inter-company claims relating to Santa Fe's dissolution more efficient and ensure that all claimants with legitimate claims to this single fund would have access to it through the centralized bankruptcy forum. This type of liquidation approach is a perfectly legitimate bankruptcy purpose.

The contention that the Bankruptcy Cases were commenced solely to gain a tactical advantage in the Tebow Action is not supported by the factual record. Mr. Faure's testimony

shows that at the time the Bankruptcy Cases were filed, Debtors were parties to other lawsuits, specifically the Ellison and Harris Actions, Memorial was being investigated by the EPA and California Water Board relating to the California Property. Debtors were also concerned about future oilfield legacy cases, a credible fear given that, according to Mr. Faure, oilfield legacy cases were becoming prevalent in Louisiana and elsewhere and that Santa Fe, or its predecessors, operated in many parishes in Louisiana and in other states. In addition, Memorial was a party to the Sinz and Troia Actions as of the Petition Date.

Debtors concerns regarding future claims was justified. Indeed, since the Petition Date, Memorial was implicated in the Boudreaux Action and Santa Fe was named as a defendant in the Tripkovich Action. Santa Fe also was served with a subpoena in the Dore Energy Action, an oilfield legacy case similar to the Tebow Action, with respect to which Santa Fe understands it is in the subject property's chain of title.

BEPCO's argument that the petitions should be dismissed because Debtors have mismanaged their assets must also fail. Although neither of the Debtors conducts active commercial operations, Debtors have assets that can be liquidated and used to pay claims in the Bankruptcy Cases. The Insurance Review Project has uncovered numerous insurance policies that appear to cover claims against Debtors. D-Exh. 74 evidences the effort made by Debtors since the Petition Date to identify insurance policies that may provide coverage for claims against them and to preserve Debtors' rights under policies by giving notice of claims to, and otherwise communicating with, insurers. Debtors also have and have preserved their claims against insurers and parties to sale contracts (BP and PNP) for

57

indemnity and defense costs with respect to claims relating to the Ellison, Tebow and other

Actions. Debtors' possible recovery from other GlobalSantaFe entities, i.e., the Alter Ego

Claims, an issue to be resolved, also constitutes a potential asset. BEPCO has produced no

evidence that would demonstrate that these assets have been squandered. Thus, the Court

concludes that the evidence of record demonstrates that the Debtors have not mismanaged

their assets.

The Bankruptcy Cases should not be dismissed or converted (or abstained from). The

actions taken by Debtors after commencement of the cases have benefitted Debtors' estates.

Debtors have, in connection with the Bankruptcy Cases:

> (a)     asserted the automatic stay in connection with the Tebow,
> Ellison Harris, Sinz, Troia, Boudreaux Actions, and other
> matters, to limit the estate's involvement in litigation other than
> in this Bankruptcy Court;

> (b)     facilitated dismissal of Debtors as defendants from the
> Ellison, Harris, Tebow, Sinz and Troia Actions and, again, to
> centralize these claims in the Bankruptcy Court forum;

> (c)     established a bar date to set the number of claims; fixed
> the notice problem that existed with respect to Santa Fe's
> dissolution;

> (d)     subject to claims that may hereafter be asserted, if any,
> created a known universe of claims;

> (e)     analyzed the BEPCO claims to be able to file a motion
> contesting whether BEPCO has any legally cognizable claim at all
> against Debtors;

> (f)     taken advantage of the breathing spell afforded by
> bankruptcy to inventory and analyze potentially applicable
> insurance policies and related information;

(g)    pursuant to the Insurance Review Project discovered the London Market Policies, which appear to provide coverage for legacy cases (including the Tebow related claims) and other insurance policies that may respond to other claims in the Bankruptcy Cases (Sinz and Troia);

(h)    commenced and continued substantive communications with insurers, including those identified in connection with the Tebow Action and those subsequently identified pursuant to the Insurance Review Project;

(i)    negotiated and proposed a settlement of issues with the GlobalSantaFe Entities under which, inter alia, they will continue to cooperate in the pursuit of insurance rights and will contribute well over $1,000,0000 in cash and other value so that substantial value can be delivered to all the creditors of the estates on their claims;

(j)    formulated the Plan; and

(k)    continue to manage and search for assets.

Through the bankruptcy process, as exemplified by the Insurance Review Project, the Plan, the Settlement[8] and other actions they have taken in the Bankruptcy Cases, Debtors are working to provide additional value to creditors, which is a legitimate and valid bankruptcy purpose for the Bankruptcy Cases.

D.    Dismissal Under Section 305 Of The Bankruptcy Code Is Not Warranted

Section 305 of the Bankruptcy Code provides that a court may dismiss a bankruptcy case if "the interests of creditors and the debtor would be better served by such dismissal. . .." Dismissal under Section 305 should be used sparingly. *Interpool Ltd. v. Certain Freights of*

---

[8]    Although their viability may be imperiled by the Court's ruling, the Plan and Settlement nonetheless are indicia of the Debtors' efforts and good faith in filing the Bankruptcy Cases.

the *M/v Venture Star*, 878 F.2d 111, 114 n. 9 (3d Cir. 1989) (citations omitted). Section 305 represents an extraordinary remedy which should be granted only in egregious situations. *In re Monsour Medical Center*, 154 B.R. 201, 206-7 (Bankr. W.D. Pa. 1993); *In re Mazzocone*, 200 BR. 568, 575 (E.D. Pa. 1996). Dismissal is warranted only in instances where the interests of both debtor and creditors would be served. *Monsour*, 154 B.R. at 207. In dealing with motions to dismiss under Section 305, courts consider a number of factors including, but not limited to: (i) who filed the bankruptcy petition; (ii) the availability of another forum to resolve pending disputes; (iii) the necessity of federal proceedings to achieve a just and equitable solution; (iv) the expense of the federal proceedings in comparison with proceedings in another forum; (v) the purpose of the party seeking to remain in bankruptcy court; and (vi) the economy and efficiency of having the bankruptcy court handle the matter and possible prejudice to other parties. *Mazzocone*, 200 BR. at 575.

At the time these cases were filed, Debtors were faced with numerous existing claims in the Ellison, Tebow, Harris, Sinz, and Troia Actions as well as anticipated legacy lawsuits in Louisiana and elsewhere, and environmental claims asserted by the EPA and California Water Board. These matters were pending in jurisdictions throughout the country. Litigating these, and other claims, in Bankruptcy Court is the most efficient way to resolve them. Liquidating in this Court also will ensure that available assets will be distriubted on an equitable basis. Accordingly, the Motion to Dismiss on Section 305 grounds is DENIED.

## IX.  CAUSE EXISTS TO GRANT BEPCO RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d) TO LIQUIDATE ITS CLAIMS AGAINST THE DEBTORS AND THEIR INSURERS, AND TO RECOVER FROM AVAILABLE INSURANCE PROCEEDS

### A.  The Court Will Modify the Automatic Stay

In *In re Rexene Prod. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992), the Court explained in determining whether there is "cause" to modify the automatic stay that courts often consider whether: (a) any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; (b) the hardship to the movant by maintenance of the stay considerably outweighs the hardship to the debtor; and (c) the movant has a probability of prevailing on the merits. Additionally, the Court should consider the policies underlying the automatic stay. *See In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).

In general, when the movant makes a *prima facie* case for relief from the automatic stay, as set forth in section 362(g) of the Bankruptcy Code, the burden of going forward and the burden of persuasion shift's to the party opposing relief on all issues, except for issue of whether the debtor has equity in the subject property, if applicable. 11 U.S.C. § 362(g). *See also Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) (Movant has the initial burden in proving a prima facie case of cause, which if proved, must be rebutted by the debtor is the stay is not to be lifted.).

The automatic stay should not preclude BEPCO from proceeding on its claims against the Debtors and their liability insurers.

61

### B.  The Applicability Of The Automatic Stay, If Any, To The
<u>Proceeds Of The Debtors' Liability Insurance Proceeds Is Tenuous</u>

The threshold determination to be made in evaluating BEPCO's request for relief from

the automatic stay is whether and to what extent the Debtors have an interest that is protected

by the automatic stay that would be affected by actions BEPCO seeks to take.  BEPCO seeks,

among other relief, to liquidate its claims against the Debtors in an available non-bankruptcy

forum and to recover against, *inter alia,* available liability insurance proceeds.  Generally

speaking, this entails two types of actions: (1) an action against the Debtors for which there

may be coverage available under the Debtors' liability insurance policies; and (2) a direct

action against the Debtors' liability insurers pursuant to Louisiana's direct action statute, LA.

REV. STAT. ANN. § 22:655 *et seq.*

There is no dispute that, absent relief from the automatic stay, the automatic stay applies

to bar the commencement or continuation of an action against either of the Debtors.  *See* 11

U.S.C. § 362(a)(1).  Although the Debtors contend otherwise, since the Petition Date, BEPCO

has not commenced or continued any action against the Debtors, whether in the Tebow Action

or otherwise.  Rather, BEPCO has requested stay relief from this Court to liquidate its claims

against the Debtors to establish the Debtors' liability as a predicate to potential recoveries from,

*inter alia,* the available proceeds of liability insurance policies.

It likewise is not disputed that the liability insurance policies owned by the Debtors are

property of the Debtors' estates to the extent of the Debtors' contractual rights in those policies.

*See, e.g., A C & S, Inc. v. Travelers Cas. & Sur. Co.,* 435 F.3d 252, 260 (3d Cir.), *cert. denied,*

--- U.S. --- (2006); *Houston v. Edgeworth (in re Edgeworth), 993 F.2d 51, 55 (5th Cir. 1993);*

*Estate of Lellock v. Prudential Ins. Co. of Am.,* 811 F.2d 186, 189 (3d Cir. 1987). Rather, the

principal threshold question revolves around whether the Debtors have a significant interest

protected by the automatic stay in the *proceeds* of the liability insurance policies. The law in

this area, while not entirely consistent, suggests that they do not or, at least, that any interest

they have in these cases is *de minimis*. Accordingly, this Court need not definitively determine

whether the automatic stay applies to the proceeds of the Debtors' liability insurance policies

because on the facts presented such interest, if it exists, is sufficiently insignificant as not to

support the continued imposition of the automatic stay in these cases.

The Fifth Circuit's *Edgeworth* decision, a leading case on the subject, has held without

reservation that proceeds of typical liability insurance policies are *not* estate property. The

court approached this issue as an extension of the Fifth Circuit's earlier analysis of the

distinction between D&O liability insurance policies and the proceeds thereof, as articulated

in *In re Louisiana World Expo., Inc.,* 832 F.2d 1391 (5th Cir. 1987). *Edgeworth,* 993 F.2d at

55 (citing *Louisiana World Expo.,* 832 F.2d at 1399). Taking pains to distinguish liability

insurance policies from policies where the debtor is the beneficiary, the court explained its

reasoning as follows:

> The overriding question when determining whether insurance
> proceeds are property of the estate is whether the debtor would
> have a right to receive and keep those proceeds when the insurer
> paid on a claim. When a payment by the insurer cannot inure to
> the debtor's pecuniary benefit, then that payment should neither
> enhance nor decrease the bankruptcy estate. In other words, when
> the debtor has no legally cognizable claim to the insurance

proceeds, those proceeds are not property of the estate.

Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary. Proceeds of such insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors. But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

*Ellsworth*, 993 F.2d at 55-56. *See also Landry*, 260 B.R. at 788 ("Because of the insurance, the estate property is liable for a smaller amount of claims (calculated by subtracting from the entirety of the claims base the amount of insurance coverage). However, to hold that the debtor has a legal or equitable interest in property used to pay the covered claims because payment of the covered claims by some other party with that party's property may decrease the debtor's overall liability, is utterly backward.").

Neither the Third Circuit nor this Court appears to have squarely addressed the question of whether a debtor ordinarily has a property interest in the proceeds of liability insurance that constitutes property of the estate under section 541(a) of the Bankruptcy Code protected by the automatic stay, but the limited body of case law in this Circuit addressing analogous issues suggests that the Third Circuit will follow the reasoning of *Edgeworth* and its progeny. For instance, in *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993), on the facts before it, the Third Circuit recognized a distinction between ownership of a life insurance policy and the proceeds thereof that resulted in the exclusion from the estate of the proceeds pursuant to

section 54 l(d) of the Bankruptcy Code. *Id.* at 117 (citing *Louisiana World Expo.*, 832 F.2d at 1400-0 1).

Several courts also have drawn important distinctions between a debtor's equitable interest in liability insurance proceeds when a legitimate reorganization of a going concern enterprise is being attempted by a debtor facing mass tort liabilities in excess of available liability insurance coverage on the one hand, and liquidation cases such as the one now before the Court, on the other. In *In re Scott Wetzel Serv., Inc.*, 243 B.R. 802, 804-05 (Bankr. M.D.Fla. 1999), the Court explained the reason why the estate might have an equitable interest in liability insurance proceeds in the former but not the latter:

> In several cases where the liability insurance proceeds were insufficient to cover all tort claims potentially falling within the debtor's insurance coverage, courts either have held that the liability insurance proceeds fall within the scope of "property of the estate" or have enjoined the litigation under 11 U.S.C. § 105. ... In those cases, however, the debtors filed Chapter 11, seeking to reorganize by centralizing numerous lawsuits in a single forum and obtaining relief from tort liability.
>
> Those cases are clearly distinguishable from the case at hand. Although a debtor's legal interests become property of the estate in both Chapter 7 and Chapter 11 cases, the debtor's equitable interests are very different. *See In re Correct Mfg. Corp.*, 88 B.R. 158, 161 (Bankr. S.D. Ohio 1988).
>
> . . . [The Chapter 11 debtor] has equitable interests in the proceeds of such policies because of its need to decrease liability from which third parties' claims derive, affect the outcome of suits against its insurers, and retain the ability to structure settlements of classes of claims. Therefore, despite the recognition of those types of equitable interests in the cases cited in which suits against insurers were stayed during Chapter 11 reorganization proceedings, those equitable

65

interests are not relevant or present in this case.

Correct Mfg. Corp., Id. at 162.

The estate's interests do not encompass the right to receive the proceeds of the Liability Insurance Policies and no equitable interests relevant only in Chapter 11 reorganization cases exist. *See Correct Mfg. Corp., Id.*

*Scott Wetzel Serv.,* 243 B.R. at 805.

These cases, while filed under chapter 11, are not filed in furtherance of preserving any going concern or maximizing value of any non-insurance assets. Nor is there any reason to believe that the proceeds of the liability insurance policies will be insufficient to satisfy all claims presented.

Likewise, this Court has repeatedly held that the bankruptcy estate has no protectable property interest in the proceeds of D&O liability insurance when it appeared unlikely that the proceeds of the D&O insurance would be totally exhausted by the non-debtor claims being presented under it or the debtor was not itself subject to claims that were at risk of being left uninsured. *See, e.g., Miller v. McDonald (In re World Health Alternatives, Inc.),* 369 B.R. 805, 810-11 (Bankr. D. Del. 2007); *In re Allied Digital Tech. Corp.,* 306 B.R. 505, 512-13 (Bankr. D. Del. 2004). In such situations, this Court has recognized that "the proceeds of the Debtor's insurance policy are not property of the estate" because the estate's interest in the proceeds is defined by the terms of the policies and in no way superior to the interest of other, non-debtor parties intended to be benefited by the policies. *World Health,* 306 B.R. at 811. *See also Allied Digital,* 306 B.R. at 512-13.

66

The import of all of these cases is that there is virtually no support in the context of these bankruptcy cases for the notion advanced by the Debtors and GSF Entities that the automatic stay should be continued in effect to prevent BEPCO from accessing the proceeds of these liability insurance policies.  Congress has recognized precisely this point through the BAPCPA amendment to section 1112(b) of the Bankruptcy Code, which identifies as "cause" for conversion or dismissal "failure to maintain appropriate insurance that poses a risk to the estate or to the public." 11 U.S.C. § 1112(b)(4)(C). *See also, e.g., In re Campbell-Erskine Apothecary, Inc.,* 302 B.R. 169, 174 (Bankr. W.D. Pa. 2003) Holding the proceeds of these liability insurance policies beyond the reach of BEPCO when the insurance was intended to protect BEPCO and other members of the public from the Debtors wrongdoing, would frustrate the very goal that Congress has affirmed should be held in high regard.

### B.  There Will Be No Prejudice To The Debtors Or Their Estates If The Stay Is Lifted

The traditional function of the automatic stay as a "breathing spell" for the debtor will not be frustrated here.  *See McCartney v. Integra Nat'l Bank N.,* 106 F.3d 506, 509 (3d Cir. 1997).  Indeed, the Debtors have enjoyed a "breathing spell" of eighteen months.

In practical effect, BEPCO seeks to liquidate its claims as a predicate to recovering under applicable liability insurance policies and from other non-debtor sources and to be able to proceed with whatever claims and remedies are available to it to satisfy its claims from such sources.  In these cases, in which the assets other than insurance proceeds are negligible, there can be no legitimate complaint that the estates will be dissipated by allowing the litigation to

go forward. As one respected treatise explains,

> [w]hen the court is reasonably confident that the policy proceeds will be sufficient to satisfy all creditors with claims that may be paid under the policy, the court should grant relief from the stay to permit an action either against the debtor, if necessary, or directly against the insurer. Because the policy proceeds will be available only to creditors with the type of claims covered by the policy, there is no depletion of assets that would otherwise be available to satisfy general, unsecured claims, and there is therefore no reason to delay the creditor seeking to recover under the policy.

3 Collier on Bankruptcy ¶ 362.07[3][a] at 362-85. *See International Bus. Mach. v. Ferstrom Stor. and Van Co. (In re Ferstrom Stor. and Van Co.),* 938 F.2d 731, (7th Cir. 1991) ("[D]ebtor-defendants suffer little prejudice when they are sued by plaintiffs who seek nothing more than declarations of liability that can serve as a predicate for a recovery against insurers, sureties, or guarantors.").

The record of this case establishes that BEPCO's recovery against available insurance proceeds will in no way negatively impact the rights of the handful of other creditors in these cases. The London Market Policies, which are the primary source of coverage for the claims BEPCO seeks to pursue, contain no aggregate coverage limits for a given policy period. In any case, limits per occurrence are more than sufficient to satisfy BEPCO's claims.

Moreover, it is undisputed that if coverage exists for the claims of the Sinz and Troia plaintiffs (the only other creditors in these cases that appear to have claims for which insurance coverage may be available), it will arise under insurance policies separate and distinct from those likely to provide coverage for BEPCO's claims.

68

## C.  BEPCO Is Significantly Harmed By Its Inability To
### Proceed Against Available Liability Insurance Proceeds

In contrast to the Debtors, BEPCO has been and continues to be significantly harmed by the effects of the automatic stay.  BEPCO, which was proceeding in the Tebow Action on the basis that it and Santa Fe, among others, were conducting a joint defense, was stymied in its ability to present an effective defense by Santa Fe's decision to file a bankruptcy petition after the close of fact discovery.  BEPCO was forced to try the case without the presence of the only other viable defendant as to claims on which BEPCO faced exposure.

BEPCO ultimately settled the Tebow Action and has made a settlement payment in the amount of $20 million in connection with the settlement.  Despite the existence of viable claims against Santa Fe, and possibly against Memorial and the GSF Entities, resulting from the losses BEPCO suffered in the Tebow Action, BEPCO has been and continues to be frustrated in its efforts to be made whole.

At its most basic level, this prejudices BEPCO to the extent of the lost time value of money for the settlement funds it has already paid out to resolve its liability in the Tebow Action.  More critically, BEPCO is prejudiced by the lapse of time in terms of its ability to effectively prosecute its claims.  Witnesses and documents may become unavailable.  This is of particular concern in the case of the Debtors considering, among other things, the fact that all of the Debtors' books and records are in the custody of the GSF Entities and the advanced state of the Debtors' liquidation.

Delay also disadvantages BEPCO in terms of its ultimate ability to recover under the liability insurance policies. The length of time that has already passed presents difficult hurdles for BEPCO in connection with its ability to identify and contact all of the appropriate representatives of the insurers. This difficulty, no doubt, will increase over time.

It also is an important consideration here that the Debtors' recently filed Plan offers no prospect of relief from the effects of this delay. The Plan contains no commitments from any insurer to fund the distributions to claimants such as BEPCO. Nor does it offer any effective mechanism that would ensure that insurance recoveries could be procured on a more expedited basis than were BEPCO left to its own devices. The Plan trustee will remain dependant on the GSF Entities to identify and secure rights under applicable insurance policies because the GSF Entities will have the protection of releases and channeling injunctions well before they may ever be called upon to provide any material assistance to the Plan trustee.

### D.  BEPCO's Claims Have Merit Well In Excess Of The Minimal Threshold Required To Obtain Stay Relief Under These Circumstances

"Even a slight probability of success on the merits may be sufficient to warrant stay relief in an appropriate case." *American Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 152 B.R. 420, 426 (D. Del. 1993). "The required showing is very slight." *Rexene*, 141 B.R. at 578 (citing *Peterson v. Cundy (In re Peterson)*, 116 B.R. 247, 250 (D. Colo. 1990)). The *Peterson* case relied on by the *Rexene* court explains that a merits analysis is only appropriate in cases where "the movant has sought relief from the stay to pursue a specific remedy not available under the Bankruptcy Code, or because its security

70

interest is not adequately protected." *Peterson,* 116 B.R. at 249. Even then, "all that is required is that the movant make more than a 'vague initial showing' that he can establish a prima facie case." *Id.* (quoting *In re Reice,* 88 B.R. 676, 681 (Bankr. E.D. Pa. 1988)). In a case, such as this one where the claimant seeks only to liquidate its claims as a predicate to recovering against insurance and other non-debtor sources, to require a merits analysis would defeat the objective of economizing judicial resources and would frustrate the effort to resolve relief from stay motions expeditiously." *Peterson,* 116 B.R. at 250.

BEPCO has exceeded the very slight initial showing required of it here. While the merits of BEPCO's claims against Santa Fe are not currently before the Court for a decision, the factual predicates for BEPCO's claims against Memorial and Santa Fe amply demonstrate that they are more than colorable.

Furthermore, applicable non-bankruptcy law affords BEPCO a remedy against Santa Fe in this situation and establishes that BEPCO would be entitled to proceed but for the pendency of the bankruptcy case. The authorities supporting BEPCO's position include, but are not limited to, those identified below.

BEPCO's claim against Santa Fe is supported by, among other things, La. R.S. 31:128, et seq., La. Civil Code Article 2683, contract, lease, assignment, contribution, indemnity, conventional and legal subrogation, and any other basis in law and equity. *See also Corbello v. Iowa Productions,* 850 So.2d 686 (La. 2003); *Terrebonne Parish School Board v. Castex Entergy, Inc.,* 893 So.2d 789 (La. 2005).

71

Under Louisiana law, all parties in the chain of title to an oil and gas lease are obligated to the lessor/landowner to restore the leased property to the condition it was in when the lease was granted, ordinary wear and tear excepted. La.-C.C. art. 2683.

Under Louisiana law, when a mineral lessee acts unreasonably, negligently, or excessively, the damage resulting from its acts is not "ordinary wear and tear." To the extent that such action causes damage to the property, the lessee must restore the property. *Terrebonne Parish School Board v. Castex Entergy, Inc.,* 893 So.2d 789 (La. 2005).

The Louisiana Supreme Court has held that the landowner may recover damages for pollution of the groundwater on his property. *Corbello v. Iowa Production,* 850 So.2d 686 (La. 2003). The amount which the lessor/landowner can recover as restoration costs is not limited to the value of the land. The lessor/landowner is entitled to recover whatever it will cost to restore the premises. *Corbello v. Iowa Production,* 850 So.2d 686 (La. 2003).

All mineral lessees in the chain of title are liable in solido (jointly and severally) for obligations arising under the lease. La. R.S. 31:128-129; *Kleas v. Mayfield,* 404 So.2d 500, 506 (La. App. 3d Cir. 1981). Having paid damages to the Tebow Plaintiffs, BEPCO is entitled to seek contribution or indemnity from its co-obligor, Santa Fe. La. C.C. art. 1805; *Constans v. Choctaw Transport Co.,* 712 So.2d 885 (La. App. 4th Cir. 1997).

To the extent that pollution damages arose from the use and closure of the East Pit, where Bass claims it had no involvement, BEPCO may be entitled to full indemnity from Santa Fe. La. C.C. art. 1804; *Smith Brothers & Co. v. New Orleans & North East Railroad,* 33 So. 769 (La. 1903); *Truxillo v. Gentilly Medical Building, Inc.,* 225 So.2d 488 (La. App. 4th Cir.

72

1969); *Joyner v. Aetna Casualty & Surety Company,* 251 So.2d 166 (La. 1971). A basis for

indemnity is restitution, the indemnitor (Santa Fe) having been unjustly enriched when the

person seeking indemnity (BEPCO) has discharged liability that was the indemnitor's

responsibility. *Illinois Cent. Gulf R. v. Deaton, Inc.,* 581 So.2d 714, 717 (La.App. 4 Cir.).

E.  The Debtors' Lack of Incentive to Pursue Insurers Also
Supports Granting BEPCO Relief From The Automatic Stay

The Court is not satisfied that Debtors have the necessary incentive to pursue its insurers

and this concern supplies ample cause for the stay to be lifted as to BEPCO to allow it to pursue

all of its rights, claims and remedies against the Debtors and their liability insurers and, subject

to the disposition of pending motions before the Court, the GSF Entities. *See, e.g., In re Dixie*

*Broadcasting, Inc.,* 871 F.2d 1023, 1027 (11th Cir. 1989); *In re Kaplan,* 264 B.R. 309, 335-336

(Bankr. S.D.N.Y. 2001); *Conference Church,* 184 B.R. at 218.

## X.  BEPCO'S ACTIONS IN CONNECTION WITH THE TEBOW ACTION GAVE RISE TO NO ACTIONABLE VIOLATIONS OF THE AUTOMATIC STAY

The Debtors continue to assert that BEPCO willfully "violated the

automatic stay by its various attempts to assert and prosecute claims against the Debtors, and

the Alter Ego Claims and the Insurance Claims, in the Tebow Action and/or otherwise." Pre-

Trial Order at 30. The Debtors allege that BEPCO's acts in violation of the automatic stay

included the following: "(i) filing the Third Party Complaint; (ii) filing the Motion to Reinstate;

(iii) filing the Notice of Removal; [and] (iv) filing the Motion to Transfer . . . ." Id. at 31. In

the context of these cases, however, the conduct about which the Debtors complain do not

73

constitute actionable violations of the automatic stay.

Preliminarily, the automatic stay was not violated by BEPCO's filing of the Third Party Complaint or its filing of the Motion to Reinstate. Neither act was the commencement or continuation of an action against the Debtors prescribed by Code Section 362(a)(1) or an act in furtherance of a claim against the Debtors prescribed by section 362(a)(6). Indeed, Santa Fe was not even named as a defendant in the Third Party Complaint, which sought recovery only from the GSF Entities, certain of the Debtors' insurers and other non-debtor parties. The automatic stay does not extend to benefit such non-debtor parties.

Furthermore, for the reasons discussed above, it is highly doubtful, given the circumstances of these cases, that the Debtors had any equitable interest in the proceeds of the liability insurance policies at issue in the Third Party Complaint or in the Alter Ego Claims. There is no suggestion that the interests of the Debtors' estates were or could have been prejudiced had BEPCO continued to proceed with such claims. Accordingly, there appears to be little, if any, merit to the Debtors' charge that such actions violated the automatic stay as acts "to obtain possession of property of the estate or of property from the esate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

The subsequent acts complained of by the Debtors, including BEPCO's attempted removal and transfer of the Tebow Action to this Court have no obvious connection to the automatic stay. Significantly, Santa Fe was no longer a party to the Tebow Action at the time these filings were made.

Moreover, it is clear that BEPCO's purpose in filing the Notice of Removal and the Motion to Transfer was to facilitate a determination by this Court of whether the automatic stay applied in the first instance to any aspect of the Tebow Action and whether BEPCO was entitled to relief from the automatic stay to proceed with the Third Party Complaint and other actions necessary to its ability to effectively defend the Tebow Action. For instance, the Motion to Transfer stated of BEPCO's intentions:

> In view of the letter from bankruptcy counsel for Santa Fe, Bass could not proceed with this motion without risking contempt of the bankruptcy court and risking the damages described in the August 30, 2006 letter.
>
> . . . .
>
> Once the disposition of the location of this litigation is resolved, Bass intends to investigate, and if appropriate, file the necessary pleadings to examine the propriety of the bankruptcy filings as well as to file a motion to lift the stay to add Santa Fe and Memorial as a third party defendants [sic] to the Removed Action.

BEPCO's conduct in filing and pursuing the Notice of Removal and Motion to Transfer was entirely consistent with the automatic stay in these cases. The imposition of the automatic stay in a bankruptcy case "does not divest all other courts of jurisdiction to hear every other claim that is in any way related to the bankruptcy proceeding." *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir. 1990). *See also, e.g., In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 347 (2d Cir. 1985). Since other courts retain the power to construe the scope of the automatic stay in relation to matters before them, as this Court has recognized, litigants cannot be held to have violated the stay for their good faith

participation in such proceedings:

> Since a non-bankruptcy court has the right to consider whether the automatic stay order applies to matters before it, it logically follows that the parties before that court have the right, indeed perhaps the duty, to express to that court their views on whether the stay order applies to such matters. Absent bad faith conduct, the exercise of that right by the parties before the non-bankruptcy court cannot constitute a violation of the stay order.

*Conference Church,* 184 B.R. at 216.

As in *Conference Church,* there is no evidence here that BEPCO's actions in the Louisiana state and federal courts related to the Tebow Action were anything other than in good faith. As the Debtors have acknowledged, from its first appearance at a hearing in these cases on September 8, 2006, BEPCO has agreed and committed to having issues related to the automatic stay determined by this Court. (B-Exh. 230, at 4:19 – 5:11)

Even assuming the existence of one or more technical violations of the automatic stay occurred in the early stages of these bankruptcy cases, there is no reason in the context of these cases for this Court to subject BEPCO to an injunction, grant an award of actual damages, impose punitive damages or grant other relief. The "willfulness" element of section 362(k)(1) is negated here because BEPCO "had persuasive legal authority for [its] position and a good faith belief in the validity of [its] actions." *Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network),* 329 B.R. 481, 488 (Bankr. D. Del. 2005) (citing *University Med. Ctr. V. Sullivan (In re University Med. Ctr.),* 973 F.2d 1065, 1088 (3d Cir. 1992). *See also Conference*

*Church,* 184 B.R. at 217 (denying contempt sanctions where actions were taken based on persuasive legal authority); *Healy/Mellon-Stuart Co. v. Coastal Group, Inc. (In re Costal Group, Inc.),* 100 B.R. 177, 179 (Bankr. D. Del. 1989) (holding that a "scintilla of suggestion" in case law that supports a position removes the action from being classified as a willful violation). As discussed above, there is significant support for the position advanced by BEPCO that the proceeds of liability insurance are not property of the estate protected by the automatic stay.

## XI. THE DEBTORS AND GSF ENTITIES ARE NOT ENTITLED TO THE EXTRAORDINARY RELIEF OF AN INJUNCTION UNDER 11 U.S.C. § 105(A)

In the current posture of these cases, the Debtors' request for an injunction pursuant to section 105(a) of the Bankruptcy Code against BEPCO pursuing the Insurance Claims and the Alter Ego Claims is, in effect, a request for issuance of a permanent injunction and must meet that exacting standard. That relief is precisely what the Debtors have now proposed be granted to the GSF Entities under their Plan. The Debtors are unable to demonstrate that this is the rare case where such extraordinary relief is appropriate. *See, e.g., In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 936 (Bankr. W.D. Mo. 1994) ("[A] permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above are present will this Court even entertain the possibility of a permanent injunction."); *Combustion Engineering,* 391 F.3d at 236 ("[T]he equitable powers authorized by § 105(a) are not without limitation, and courts have cautioned that this section 'does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable

77

law, or constitute a roving commission to do equity.'") (quoting *Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 680-81 (2d Cir.2003)).

As discussed above, the Debtors and GSF Entities cannot satisfy their heavy burden for such an injunction because reorganization of these debtors and rehabilitation of these estates is an impossibility. "The practical effect of the § 105(a) injunction here is to extend bankruptcy relief to . . . non-debtor companies outside of bankruptcy." *Combustion Engineering*, 391 F.3d at 237. Such far-reaching action simply is not a proper use of the reservoir of equitable power contained within section 105(a) of the Bankruptcy Code. *Id.* at 236 ("[S]ection 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Code."). Accordingly, the injunction must be DENIED.

## XII. REMAINING ISSUES

The parties are correct that BEPCO's Alter Ego Claims were not to be and are not addressed in the Court's ruling. The GSF Entities have a motion for summary judgment pending on the issue of BEPCO's entitlement to pursue such claims. Given the Court's ruling that BEPCO is entitled to proceed against the Debtors and their insurers, it is unclear whether and to what extent BEPCO wants to prosecute its Alter Ego Claims against the GSF Entities at this time. Accordingly, the Court requests that the parties schedule a hearing at the earliest availability of the parties and the Court to resolve the scheduling of a hearing to determine the future course of BEPCO's Alter Ego Claims.

The Court's ruling granting BEPCO leave to proceed on its claims against Debtors and their insurers does not answer the question of in which forum the action should proceed. It is the Court's view that it should adjudicate any such action. However, because the parties did not specifically address the issue in their post-trial submissions, the Court wants to consider their positions on the propriety and practicality of requiring BEPCO to file any action against Debtors and their insureds in this Court. The Court will consider the parties' positions at the hearing referenced above.

Finally, the Court's decision will likely cause the Debtors to reevaluate the Plan, as filed. The Court will discuss the Plan process at the forthcoming hearing.

_Kevin Gross_
U.S.B.J.

# EXHIBIT B

[Reconsideration Opinion and Order]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, et al., | ) | Case No. 06-10859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ———————————————————— | ) | **Re Dkt. Nos. 296 & 299** |
| SANTA FE MINERALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50822(KG) |
| | ) | |
| BEPCO, L.P., formerly known as BASS | ) | |
| ENTERPRISES PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| GLOBALSANTAFE CORPORATION, | ) | |
| GLOBALSANTAFE CORPORATE SERVICES | ) | |
| INC. AND ENTITIES HOLDING, INC. | ) | |
| | ) | |
| ———————Intervenors.———————— | ) | **Re Dkt No. 169 & 172** |

## <u>ORDER</u>

This matter came before the Court on (1) Debtors' Motion for (I) Under Fed.R.Bankr.
P. 7052, 9023 and 9024 Clarification and/or Reconsideration and/or Amendment of the
Court's February 15, 2008, Findings of Fact and Conclusions of Law and Related Order; and
(II) Under Fed.R.Bankr. P. 7062 and 8005, for Entry of an Order Staying Effectiveness of
the Court's Findings of Fact and Conclusions of Law and Related Order Pending Resolution
of this Motion and/or and Related Appeal (D.I. 296/169); (2) Motion of BEPCO, L.P., f/k/a
Bass Enterprises Production Company for Entry of an Order (I) Granting Reconsideration,

In Part, of the Court's Opinion and Order, Each Dated February 15, 2008; (II) Upon Reconsideration, (A) Vacating that Portion of the Opinion and Order Denying the BEPCO Dismissal/Conversion Motion and (B) Amending the Opinion and Order to Grant the Relief Requested in the BEPCO Dismissal/Conversion Motion and (III) Granting Related Relief (D.I. 299/172); (3) The GSF Entities Motion for Joinder in Debtors' Motion for Clarification (D.I. 298/171) and (4) Letter memoranda addressing the forum issue (D.I. 303/175, 308/180, 315/187, 319/190, 321/191).

For the reasons provided in the Memorandum Opinion on Reargument, IT IS ORDERED that:

1.    The Court grants reargument and reconsideration pursuant to Rules 7052 and 9023 of the Federal Rules of Bankruptcy Procedure and Rules 59 and 60 of the Federal Rules of Civil Procedure.

2.    The Court denies BEPCO's request (a) to vacate those portions of the Opinion and Order, dated February 15, 2008, which denied the BEPCO Dismissal/Conversion Motion, and (b) to amend the Opinion and Order to grant BEPCO's Dismissal/Conversion Motion.

3.    Debtors' and the GSF Entities' request for clarification has been addressed in the Memorandum Opinion on Reargument.

4.    BEPCO is granted leave to proceed with the litigation which the Court authorized by granting the Lift Stay Motion in Louisiana state court against Santa Fe Minerals, Inc., but not against 15375 Memorial Corporation at this time.

5.    The Court directs the parties to submit a stipulation and order scheduling the completion of briefing on the GSF Entities motion for summary judgment in the declaratory judgment adversary proceeding.

Dated: April 16, 2008

KEVIN GROSS, U.S.B.J.

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 15375 MEMORIAL CORPORATION, et al., | ) | Case No. 06-10859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| —————————————————————— | ) | **Re Dkt. Nos. 296 & 299** |
| SANTA FE MINERALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50822(KG) |
| | ) | |
| BEPCO, L.P., formerly known as BASS | ) | |
| ENTERPRISES PRODUCTION COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| GLOBALSANTAFE CORPORATION, | ) | |
| GLOBALSANTAFE CORPORATE SERVICES | ) | |
| INC. AND ENTITIES HOLDING, INC. | ) | |
| | ) | |
| Intervenors. | ) | **Re Dkt No. 169 & 172** |

<u>**MEMORANDUM OPINION ON REARGUMENT**</u>[1]

**BY: KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE**

The Court has before it motions for reconsideration and clarification of its Findings

of Fact and Conclusions of Law and Order, dated February 15, 2008 ("the Decision") (D.I.

291/164 & 292/165). The numerous pleadings presently before the Court and which are the

subject of this opinion are:

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by
Federal Rule of Bankruptcy Procedure 7052.

(1) Debtors' Motion for (I) Under Fed.R.Bankr. P. 7052, 9023 and 9024 Clarification and/or Reconsideration and/or Amendment of the Court's February 15, 2008, Findings of Fact and Conclusions of Law and Related Order; and (II) Under Fed.R.Bankr. P. 7062 and 8005, for Entry of an Order Staying Effectiveness of the Court's Findings of Fact and Conclusions of Law and Related Order Pending Resolution of this Motion and/or and Related Appeal (D.I. 296/169) ("Debtors' Motion for Clarification").[2]

(2) The GSF Entities Motion for Joinder in Debtors' Motion for Clarification (D.I. 298/171).

(3) Motion of BEPCO, L.P., f/k/a Bass Enterprises Production Company for Entry of an Order (I) Granting Reconsideration, In Part, of the Court's Opinion and Order, Each Dated February 15, 2008; (II) Upon Reconsideration, (A) Vacating that Portion of the Opinion and Order Denying the BEPCO Dismissal/Conversion Motion and (B) Amending the Opinion and Order to Grant the Relief Requested in the BEPCO Dismissal/Conversion Motion and (III) Granting Related Relief (D.I. 299/172) ("BEPCO's Reconsideration Motion").

(4) Responses (D.I. 304/176, 305/177, 306/178, 311/183, 312/183, 312/184, 313/185).

(5) Letter memoranda addressing the forum issue described below (D.I. 303/175, 308/180, 315/187, 319/190, 321/191).

---

[2] At oral argument, BEPCO agreed to await the Court's reargument decision before proceeding with a lawsuit against Debtors and/or the GSF Entities. The Court has therefore not addressed the request for a stay of the effect of the Decision.

The Court agrees with the parties that the Decision warrants the Court's reconsideration and clarification discussed below. In addition, the parties have addressed the Court's request for their views on which forum is appropriate for the litigation which the Court ruled may proceed. The Court will also address the forum issue in this ruling.[3]

## Reconsideration Standard

In our Circuit, motions for reconsideration are appropriate where necessary to correct errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). *Accord, Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). This Court has articulated the standard as follows:

> A motion for reconsideration . . . is an extraordinary means of relief in which the movant must do more than simply reargue the facts of the case or legal underpinnings.

*HHCA Texas Health Servs., L.P. v. LHS Holdings, Inc. (In re Home Health Corp. of Am., Inc.)*, 268 B.R. 74, 76 (Bankr. D. Del. 2001). The moving party must instead raise controlling decisions or facts that the court overlooked and "'that might reasonably be expected to alter the conclusion reached by the court'." *Key Mech. Inc. v. BDC 56 LIV (In re BDC 56 LLC)*, 330 F.3d 111, 123 (2d Cir. 2003) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

---

[3] The Court will utilize the terms defined in the Decision.

## DISCUSSION

In the Decision, the Court denied the BEPCO Dismissal/Conversion Motion and granted the BEPCO Stay Relief Motion, thereby lifting the automatic stay to permit BEPCO to proceed with litigation against the Debtors ("the Proposed Lawsuit"). The Court asked the parties to submit their views on where the Proposed Lawsuit should proceed, i.e., in this Court or in Louisiana where BEPCO and Debtors had been defendants in the Tebow Action. The Court will address BEPCO's Motion for Reconsideration, Debtors, and the GSF Entities' Motion for Clarification of portions of the Decision and, finally, decide the forum where the Proposed Lawsuit may proceed.

### 1. BEPCO's Reconsideration Motion

The Court is satisfied that BEPCO has met the requirements for reconsideration of the Decision, *viz.*, to correct errors of law or fact. Accordingly, the Court will grant BEPCO's Motion for Reconsideration to reconsider the points BEPCO raises concerning deficiencies in the Decision.

The essence of BEPCO's arguments are:

1. The Court focused entirely on whether Debtors filed the Bankruptcy Cases in good faith and failed sufficiently to consider the "cause" argument under Code Section 1112(b)(4)(A).

2. The Court's finding that the Debtors filed the cases in good faith is clearly erroneous, resulting from the Court's failure to consider BEPCO's argument that dismissal

3

is warranted not only because Debtors filed in bad faith but, equally important, that Debtors have no material assets to preserve and distribute to creditors. BEPCO further argues that the Court misapprehended that its primary ground for dismissal is that the Bankruptcy Cases "have no reasonable prospect of making more value available to creditors than would be the case outside of bankruptcy and merely serve to frustrate legitimate creditor action." BEPCO FOF/COL, Col12.

BEPCO's criticism[4] of the Decision is fair. The Court did not address with sufficient particularity BEPCO's argument that the Bankruptcy Cases serve no purpose and therefore the Court should dismiss them. Instead, the Court principally focused on whether the Debtors' filing was in bad faith. BEPCO's Reconsideration Motion provides the opportunity to apply the Court's findings of fact and conclusions of law to BEPCO's cause argument.

BEPCO argues that the Court's analysis failed to take into account Section 1112(b) in its entirety. The statute provides in its pertinent portions that a court *shall* convert or dismiss a case if a movant establishes *cause*. The statute defines "cause" to include:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

---

[4] Although the Court's uses the word "criticism," BEPCO, Debtors and the GSF Entities presented their arguments with respect, professionalism and appropriate forcefulness to command the Court's attention. The Court is grateful for the opportunity to address concerns and to correct its errors and/or lack of clarity. It is important that the Bankruptcy Cases proceed in an orderly fashion. However, the Court was surprised by BEPCO's pointed admonition that the Court should "carefully consider the motion . . . ." (BEPCO's Reconsideration Motion at 11). The Court carefully considers all matters that come before it. The voiced threat of an appeal therefore cannot increase that which is already paramount, namely, the Court's existing concern and sense of responsibility for its work.

4

11 U.S.C. § 1112(b)(4)(A). The mandated dismissal for "cause" is discretionary under Section 1112(b)(2)(B) which excuses dismissal if there is "a reasonable justification for the act or omission," and the act or omission will be cured within a reasonable time. Importantly, however, there is no escape from dismissal if the "cause" arises under Section 1112(b)(4)(A), in which case the court "shall dismiss."

The Court does not take BEPCO's arguments for dismissal lightly. The Court found that Debtors had negative cash flow and were unable to pay current expenses. Decision at 46, 47-48. The Court further concluded that the Debtors' cash situation was poor and they did not have reliable sources of income. *Id.* Under the circumstances, the Court found that the costs and expenses of the Bankruptcy Cases, including the professional fees, represent a "substantial [and] continuing loss to or diminution of the estate." Section 1112(b)(4)(A). In addition, the Debtors do not have a "reasonable likelihood of rehabilitation." *Id.* They are non-operating entities that were resuscitated from state dissolution proceedings to file for bankruptcy.

The Court agrees with BEPCO that rehabilitation is not just another word for reorganization, it means more. Rehabilitation does not include liquidation. Rehabilitation means to reestablish a business. *See, e.g., Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004) (rehabilitation means the restoration of a business' viability, liquidation is not rehabilitation.) There are numerous similar holdings from courts in many jurisdictions. The Debtors and the GSF Entities have cited no contrary authorities.

5

The analysis does not end with the "for cause" test under Section 1112(b)(4)(A), where "shall" would appear to mandate dismissal of the Bankruptcy Cases. The Court has discretion under Code Section 1112(b)(1) if the Court specifically finds and identifies special circumstances upon which it determines that dismissal is not in the best interests of the creditors and the estate. The Court's denial of the motion to dismiss rests upon this provision and it is here that the Court did not articulate its findings in the Decision.

It is important to emphasize the context of the Bankruptcy Cases. The continuing losses, diminution of the estate and unlikelihood of rehabilitation are, practically speaking, irrelevant for reasons as as obvious as they are unusual. The Debtors are not operating and are not sustaining continuing losses. Creditors are not being prejudiced by the continuation of the Bankruptcy Cases. On the positive side, and the statute requires a finding of "best" interests[5], the creditors' best interests are served by sustaining the Bankruptcy Cases.

Specifically, the record establishes that in the course of the Bankruptcy Cases the Debtors have accomplished the following benefits for creditors:

1.    In the Insurance Review Program, the Debtors have identified insurance policies which will inure to the benefit of the claimants, including BEPCO.

2.    Debtors have given and continue to give notice of claims to insurers for the benefit of creditors.

---

[5] The Third Circuit has made it crystal clear that the absence of bad faith does not automatically translate into good faith. *NMSBPCSLDHP, L.P. v. Integrated Telecom Express, Inc.* (*In re Integrated Telecom Express, Inc.*), 384 F.3d 108, 127 (3d Cir. 2004).

6

3.      Debtors have preserved claims for indemnity and defense costs relating to the Tebow Action.

4.      Debtors have obtained dismissal of litigation or claims from which they otherwise might have been damaged.

The foregoing activities are efforts by Debtors, who continue to marshal and preserve assets and benefit creditors. In addition, if BEPCO is successful in establishing *alter ego* status between Debtors and the GSF Entities, all creditors will benefit, not just BEPCO.

BEPCO pointedly refutes the benefits of Debtors' Insurance Program and suggests that the Court was badly mistaken in accepting Debtors' arguments. The Insurance Review Program has reaped benefits for creditors and the estate and Debtors continue, as they were at the time of trial, to refine information and maintain coverage. BEPCO's dissatisfaction with Debtors' actions to make insurance available to it and other creditors is unfounded as evidenced by BEPCO's own discussion of the coverage from which BEPCO will benefit.

The Court has carefully considered the Third Circuit's holding in *Integrated Telecom*, a leading case involving dismissal for cause. 384 F.3d at 112. The Decision is not inconsistent with that ruling. The debtor in *Integrated Telecom*, like the Debtors, was not an operating company and had no going concern value to preserve. *Id.* The Third Circuit then observed that "the question therefore becomes whether [debtor's] petition might reasonably have maximiz[ed] the value of the bankruptcy estate." (citation omitted). The appellate court answered the question within the framework that maximizing value means "there is some

7

value that otherwise would be lost outside of bankruptcy. *Id.* at 120.[6] The Court of Appeals

analyzed what the debtor advanced as the benefits from the bankruptcy (in particular, an asset

sale) and found they were not significant.  The Third Circuit's premise that the bankruptcy

lacked good faith was firmly linked to the Third Circuit's conclusion that:

> The Bankruptcy Court made no finding that [debtor] was subject
> to "inchoate" claims that needed to be liquidated or barred. . . .

*Id.* at 127.  The Court of Appeals therefore ruled that Chapter 11 protection was not

necessary to protect the debtor from claims.  *Id.*

Here, in contrast, the BEPCO claim and others are claims from which Debtors have

requested protection.  Their bankruptcies have also provided them with breathing space

which Debtors have used to establish that they have insurance protection which benefits

Debtors and creditors.  Debtors also have gone beyond an inventory of their policies; they

have triggered coverage.

An important consideration for the Court in denying the Motion to Dismiss was the

fact that Debtors filed a Joint Plan of Liquidation (D.I. 222).  Section 1112(a)(2)(A)

specifically provides that the reasonable likelihood that a plan will be confirmed is, in

combination with other factors, a basis for the Court not to dismiss the Bankruptcy Case.  It

is true that the Plan, as filed, is not confirmable because of its condition that BEPCO not

obtain relief from the automatic stay.  A revised plan is therefore necessary.  The Court

---

[6] Significantly, the Third Circuit cited, with approval, *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197 (3d Cir. 2001), in which the court affirmed denial of dismissal even though the debt was owed to the debtor's parent companies.

believes there is a reasonable likelihood that a revised plan can be confirmed and, in any event, the Court is unable and unwilling to find that Debtors will be unable to propose a confirmable plan.

## 2. Debtors' and the GSF Entities' Motions for Clarification

The Debtors and the GSF Entities have requested the Court to clarify the Decision in several respects. The Court is more than willing to assist in avoiding misperceptions which might lead to unnecessary work, time or expense for the parties, or confusion in the Proposed Lawsuit or to an appellate court.

### A. Did the Court intend to permit BEPCO to pursue Memorial in the Proposed Lawsuit?

No. Santa Fe was the named defendant in the Tebow Action. Memorial's potential liability remains to be determined in BEPCO's *alter ego* claim. BEPCO insists that it is entitled to proceed against Memorial on the basis of the Demand Note whereby Memorial agreed to be liable for Santa Fe's debts. The Demand Note does not create Memorial's direct liability to third parties such as BEPCO, nor is there any evidence that Santa Fe and Memorial intended to create third party beneficiary rights. *See Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378 (Del. Super. Ct. 1990) (nonparties to a contract do not acquire rights under the contract); *Insituform of N. Am. Inc. v. Chandler*, 534 A.2d 257 (Del. Ch. 1987) (third party beneficiary rights require intent to create such rights, intent to benefit the third party in consideration of a preexisting obligation and the benefit was a material term of the contract).

B.    Is Debtors' Declaratory Judgment Action on the *alter ego* claims viable?

Yes.  The issue of whether Debtors' estate rather than Bass owns the *alter ego* claims

remains to be decided in full.

C.    Did the Court Intend to Rule on the Underlying Merits of the Bass Claims?

No.  The Court addressed two matters in the Decision: the Motion to Dismiss and the

Motion to Lift Stay.  The merits of BEPCO's claims were not before the Court and the Court

went out of its way in the Decision to make it clear that the Court was not involved in a

merits analysis.  Clearly, the Court confined itself to determining whether BEPCO could

proceed with an action, not with making findings for use in the litigation.  The Court's

findings were limited to deciding if BEPCO satisfied the "prima facie" case requirement to

lift the stay.  Similarly, the Court did not have the *alter ego* issue before it and the Court's

findings are not directed toward the Declaratory Judgment Action.

### 3.  The Proper Forum

The Court ruled in the Decision that BEPCO is entitled to commence litigation against

Debtors to recover for losses from the Tebow Action.  The Court deferred decision on the

appropriate forum for BEPCO's Proposed Lawsuit to permit the parties to state their

positions.

The Court is convinced that the litigation should proceed in a non-bankruptcy forum

of BEPCO's choosing, which is Louisiana.  The claims involve state law issues addressing

liability for contamination of groundwater and soil in Louisiana.  As such, Louisiana has a

10

compelling interest in such litigation, contrary to Debtors' and the GSF Entities' effort to characterize the matter as merely a two party dispute. The Tebow Action was also a case involving private litigants. No one could fairly deny Louisiana's interest in the Tebow Action. The Proposed Lawsuit will, by necessity, explore the impact of Santa Fe's use of its lease on Louisiana natural resources.[7]

Yet another consideration compelling the Court to allow the Proposed Lawsuit to proceed in Louisiana is the applicability of the Louisiana Civil Code. This Court is certainly capable of interpreting and applying this unique body of law, but does not possess the knowledge on the unique Louisiana Civil Code.[8]

BEPCO's citation to *In re Titan Energy Inc.*, 837 F.2d 325 (8th Cir. 1988) is persuasive. Butcher Capital Markets, Inc. ("Butcher") had purchased production facilities from Titan Energy, Inc. ("Titan"). Butcher sued Titan's insurer under Louisiana's statute allowing direct actions against insurers, claiming the facilities it purchased were defective. Butcher then filed for bankruptcy and the insurer sought relief from the bankruptcy court to enjoin Butcher's Louisiana state court action on grounds which included its claim that the policies were property of Titan's estate. The bankruptcy court refused to enjoin Butcher and

---

[7] An analysis, and application of the facts using *forum non conveniens* standards also favors Louisiana as the proper forum. *See Son v. Coal Equity, Inc. (In re Centennial Coal, Inc.)* 282 B.R. 140, 144 (Bankr. D. Del. 2002) (twelve factor test).

[8] Bankruptcy courts should defer to state courts where state law issues predominate. *Official Comm. of Unsecured Creditors v. Elkins (In re Integrated Health Servs. Inc.)*, 291 B.R. 615, 620 (Bankr. D. Del. 2003).

11

instead abstained.  The Eighth Circuit agreed that the bankruptcy court's abstention ruling

was correct.  Only Butcher was making a claim for the insurance proceeds, and Titan was

beyond rehabilitation and the litigation would therefore not delay Titan's return to business.

More importantly, the Eighth Circuit decided that because the suit required application of

state law contract law, it was best to allow that state's courts to rule.  The court concluded

that:

> Because the [insurance] policies primarily benefit Butcher, and
> because no other parties have asserted claims alleging coverage,
> the validity and scope of the policies may be adjudicated in state
> court without fear that other creditors or Titan itself will be
> irreparably harmed.

*Id.* at 333.  The same is true of BEPCO's claim and the Proposed Lawsuit will not have

ramifications for other creditors.

The parties have raised a myriad of issues in their imaginative and exponentially

growing donnybrook.  The bottom line is this: BEPCO's lawsuit should proceed in Louisiana

against Santa Fe.  If Santa Fe prevails, the parties can return to this Court for the resolution

of issues such as punitive damages (mere speculation at this point) and whether Memorial

is liable under the Demand Note.  Furthermore, the Court will have resolved the *alter ego*

issues by that time.

12

## **CONCLUSION**

The Court has reconsidered and clarified the Decision.  The Court will not dismiss the

Bankruptcy Cases and will permit the Proposed Lawsuit to proceed in Louisiana.  An order

consistent with this opinion will issue.

Dated: April 16, 2008

UNITED STATES BANKRUPTCY JUDGE

13

## CERTIFICATE OF SERVICE

I, Gregory W. Werkheiser, certify that I am not less than 18 years of age, and that service of the **BEPCO, L.P., f/k/a Bass Enterprises Production Company's Emergency Request For Certification For Direct Appeal To The United States Court Of Appeals For The Third Circuit Pursuant To 28 U.S.C. § 158(d)(2)** was caused to be made on June 4, 2008, in the manner indicated upon the parties on the attached list.

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  June 4, 2008

_____
Gregory W. Werkheiser (No. 3553)

794667.1

# SERVICE LIST

## VIA E-MAIL and HAND DELIVERY

John D. Demmy, Esquire
Stevens & Lee, PC
1105 N. Market Street
7th Floor
Wilmington, DE 19801
jdd@stevenslee.com

Francis A. Monaco, Jr., Esquire
Kevin J. Mangan, Esquire
Womble, Carlyle, Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
fmonaco@wcsr.com
kmangan@wcsr.com

Noel C. Burnham, Esquire
Montgomery McCracken
1105 Market Street
Wilmington, DE 19801
nburnham@mmwr.com

David Buchbinder, Esquire
Office of the U.S. Trustee
844 King Street
Suite 2207
Lockbox 35
Wilmington, DE 19801
david.l.buchbinder@usdoj.gov

## VIA E-MAIL and FIRST CLASS U.S. MAIL

Philip G. Eisenberg, Esquire
Mark A. Chavez, Esquire
Locke Liddell & Sapp, LLP
600 Travis Street
3400 JP Morgan Chase Tower
Houston, TX 77002
peisenberg@lockeliddell.com
mchavez@lockeliddell.com

John C. Kilgannon, Esquire
Stevens & Lee, PC
1818 Market Street
Philadelphia, PA 19103
jck@stevenslee.com

Natalie D. Ramsey, Esquire
Montgomery McCracken
123 South Broad Street
Philadelphia, PA 19109-1029
nramsey@mmwr.com

M. Hampton Carver, Esq.
Stephen Rose, Esq.
Leann Opotowsky Moses, Esq.
Carver Darden Koretzky Tessier Finn Blossman &
Areaux, L.L.C.
1100 Poydras Street - Suite 3100
New Orleans, LA 70163
carver@carverdarden.com
rose@carverdarden.com
moses@carverdarden.com

2021479.1